1

```
                        UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF ILLINOIS


UNITED STATES of AMERICA,  )    17-CR-30120
                           )
                           )
            Plaintiffs,    )
                           )
      Vs.                  )    East St. Louis, Illinois
                           )    December 5, 2018
ANTHONETTE STROWDER,       )
                           )
            Defendants,    )

                   TRANSCRIPT OF CHANGE OF PLEA,
                BEFORE THE HONORABLE DAVID R. HERNDON,
                    UNITED STATES DISTRICT JUDGE.


APPEARANCES:

For the Plaintiffs:        Assistant U. S. Attorney
                           By:  George Norwood
                           402 West Main Street
                           Benton, Illinois  62812

For the Defendants:        Preston Humphrey Esq., LLC
                           By:  Preston Humphrey, Jr.
                           1015 Locust
                           St. Louis, MO  63101

Court Reporter:            Barbara Kniepmann
                           750 Missouri Avenue
                           East St. Louis, IL  62202

Proceedings recorded by mechanical stenography, transcript
produced by computer.
```

2

```
1        (Whereupon the following proceedings were held in open
2   Court.)
3            THE COURT:  Okay, so let's go on the record and show
4   that we have called the case of United States of America
5   versus Anthonette Strowder, 17-30120.
6            The defendant is not present.  Defendant's counsel,
7   Preston Humphrey, is present.  Counsel for the Government,
8   George Norwood, is present.  The matter is set for Final
9   Pre-Trial Conference in this matter, being set for jury trial
10  on Monday, December 10th, and today is the 5th.
11           So as we talked about the last time we got together,
12  one of my primary goals with these, each of the pretrials I
13  have set, is to give some sort of trial run for the defendant
14  in order to see how she is able to make herself available in
15  the courtroom for each of the hearings, but more importantly
16  for the upcoming jury trial.
17           Defendant is on bond, so the position of the Court is
18  that it is simply the defendant's responsibility to arrange
19  for her transportation and her means to be available in the
20  courtroom.  So I ask that question because we're sitting in a
21  makeshift courtroom, one that would accommodate Miss Strowder
22  because she has a variety of challenges physically with
23  respect to her mobility and simply getting around.  She can't
24  just simply sit in a chair at the counsel table like any other
25  defendant.  She apparently is, for all practical purposes,
```

1   bedridden, and we were advised by defendant's counsel that she

2   needed a bed to sit in or to remain in during the trial.

3          So what is going on now is that it is currently

4   10:25.  We're advised that at Mr. Humphrey's request, the

5   Centralia Fire Department took her from her home and placed

6   her in her van or her family's van, some van over which she

7   has some sort of control, and that they departed Centralia

8   somewhere around 8:30, so just about two hours ago.  Based on

9   my personal knowledge, Centralia is about an hour from here at

10  most, and so with two hours having passed, the Court -- and

11  this is a matter that was set at 9:00 o'clock, by the way.

12  The Court really can draw no conclusion other than that she

13  has absconded and is not going to make herself available.

14         However, before I make that ruling formally,

15  Mr. Humphrey, have you had any contact with her this morning?

16         MR. HUMPHREY:  Your Honor, I have not had the ability

17  to speak with Miss Strowder.  I have her home phone number and

18  it is my understanding she is on her way here.  Honestly with

19  her being bedridden, I had no reason to have any other phone

20  numbers for her other than a home phone number, so I can only

21  speak to the fact that I talked to the Centralia Police

22  Department -- I am sorry, Centralia Fire Department -- and

23  what was explained to me, as you summarized on the record

24  previously, was that in my discussions with them they were

25  supposed to be there at 7:30.  The purpose of them being there

1   at 7:30 was to load her into the van so she could make it here

2   by 9:00 o'clock.  Unfortunately, they explained to me it took

3   them an hour to get her out of her house along with calling in

4   an ambulance service.  So when we're talking about those time

5   frames, I am basing that upon my discussions with the

6   Centralia Police Department and what we initially discussed.

7   So I cannot say for certain that she was on the road at 8:30,

8   but including a little bit more time there, I would assume

9   that she would be here by now.

10        I did get the impression from my conversations with

11  Miss Strowder that she had every intention of being here.  She

12  has called the past couple of days to confirm about

13  arrangements that were made as far as her transport, getting

14  out of the house and getting into Court.  It is my honest

15  belief that she is on her way here.

16        THE COURT:  So in order to establish a bit more of a

17  record, and from what I have heard and over the various

18  hearings that we have had from time to time where she was

19  never present, she is a large woman.  She was, at one time,

20  was 600 or in excess of 600 pounds in weight, but one of the

21  deputy marshals who regularly checks on her advises that he

22  believes she has lost some weight.  Looks like she has lost an

23  appreciable amount of weight.  At the present time we don't

24  know how much she weighs, is that correct?

25        MR. HUMPHREY:  We don't know for certain.  All I can

1  say in my conversation with the Centralia Fire Department this

2  morning, they said it took a crew of ten people to get her out

3  of her house.

4      THE COURT:  I was advised by I think one of her

5  lawyers, and she has had several, you are a successor to

6  several others, that when she otherwise was transported

7  somewhere by her family, something that she voluntarily wanted

8  to do, that her family had some sort of carrying device that

9  would resemble canvas with handles on it and that family

10  members would bring her out of the house and put her in that

11  trailer or in that van that they have.  Do you know if that is

12  accurate?

13      MR. HUMPHREY:  I do believe that is accurate.

14      THE COURT:  All right.  But in doing so, do you know

15  how many family members she actually enlists in order to make

16  those types of moves?

17      MR. HUMPHREY:  That I am not certain of, Your Honor.

18  It is my understanding that she has enlisted several family

19  members who are taking off work next week in order to make

20  sure that she can be here for trial.

21      THE COURT:  All right.  Mr. Norwood, do you have any

22  information yourself, either through the investigation of this

23  case or otherwise, about her mobility or challenges?

24      MR. NORWOOD:  No more than what the Court has already

25  indicated.  We have heard about the family members carrying

6

1    her on a canvas type material into State Court for prior

2    hearings.  In interviewing witnesses, I know a couple of years

3    ago she could get around on her own and could even drive.

4    This would have been approximately 2014.  As far as recently,

5    I don't have any other information than what the Court has

6    indicated as far as her mobility.

7              THE COURT:  All right.

8              MR. NORWOOD:  One moment.  Let me check with the case

9    agent.  I have nothing further, Judge.

10             THE COURT:  So Mr. Humphrey, one of my concerns,

11   obviously, is that, and I don't know anything about her record

12   or past, but one of my concerns is that she may somehow

13   maintain a belief that if she just doesn't cooperate with us,

14   this case will just go away, which is not going to happen as

15   far as I can tell.  I see no inclination on the part of the

16   Government to dismiss this case voluntarily.  So the reason I

17   say that is because that sort of gives a window into why I am

18   at this point growing very impatient with her not appearing.

19   She is an hour and a half late for a 9:00 o'clock hearing.  I

20   was more than willing to accommodate that, given that I

21   understood they were on their way, but I also understand, and

22   correct me if I am wrong, that the van is being driven by a

23   family member?

24             MR. HUMPHREY:  To my belief that is accurate.

25             THE COURT:  Okay.  And so frankly, if they just

1    decided -- there is nothing keeping her or that family member

2    from just not driving to this courthouse and just not showing

3    up, and sort of pursuing theory that I just hypothesized,

4    which is that she feels like or she may feel like if she

5    doesn't cooperate, doesn't show up, that maybe everybody will

6    just forget all of this.  So that is my greatest concern.  I

7    mean I do have other things set today.  It is not so much my

8    calendar that I am concerned about, it is that, frankly, with

9    her failing to show at every other hearing in which I directed

10   that she be present, which is, I believe, three other hearings

11   -- is that right, Alex, about three other hearings?

12          COURTROOM CLERK:  Yes, at least.

13          THE COURT:  That I don't have a lot of optimism about

14   her showing up this time either, despite the extraordinary

15   efforts that we have gone through.  I don't know anything at

16   this point other than to issue a warrant for her arrest for

17   her failure to appear because her bond requires her to appear

18   at all Court hearings and have her taken into custody with the

19   hopeful prospect that if, while in custody, or rather while in

20   custody her custodians will be able to transport her to and

21   from trial.  I have no intention of continuing the trial date.

22   It is set for Monday.

23          But one other thing I wanted to ask you about, if you

24   know, and I understood from talking with one of the deputies

25   who does check in on her regularly that she is operating some

1    sort of business.  It is a business that has to do with some

2    sort of a thrift store or something that she actually sits in

3    her home, watches monitors for closed circuit television and

4    actually gives direction to the clerks in the store as to what

5    to do and how to do it, things like that.  Do you have any

6    information about that yourself?

7         MR. HUMPHREY:  I do not, Your Honor.  I do know that

8    when you call her home and she is sleeping and it goes to

9    voice mail, she does mention that it is a business number as

10   well and you can leave a message.  About her business, I don't

11   have any other specific information about that.

12        THE COURT:  Well, my reason for inquiring, and had

13   she been here I would have inquired directly of her, and that

14   is, frankly, whether or not her financial statements made in

15   her financial affidavit remain the same or if they have

16   changed.  For example, if she is now acquiring income that she

17   didn't before, it could be that she is not qualified to have a

18   public defender represent her.  I mean if her economic

19   circumstances have changed, we have an ongoing obligation to

20   make that determination and not allow her a public defender

21   if, in fact, she can afford to hire her own counsel.  I was

22   going to inquire about that.  I wanted to know from you if you

23   had any sort of information.

24        So given what I have just been talking about in terms

25   of issuing a warrant for her failure to appear in conflict

1    with her bond, Mr. Humphrey, anything else to offer the Court?

2            MR. HUMPHREY:  No, Your Honor.  I guess the only

3    thing that I would request is that if Miss Strowder does show

4    up here --

5            THE COURT:  Hold on, they say she just got here.

6    We'll be in recess until they get her in the courtroom.

7        (Whereupon a recess was taken.  The following proceedings

8    were held in open Court.)

9            THE COURT:  So let the record reflect we're going to

10   continue with the hearing we started earlier, however, there

11   has been a change in the agenda, which is that she has agreed

12   to plead guilty, so we're going to proceed with a plea

13   hearing.

14           So let the record reflect that Miss Strowder is

15   currently in the courtroom together with her counsel.

16   Mr. Norwood continues to be here on behalf of the Government.

17           And so Miss Strowder, what I need you to do is raise

18   your right hand.  My clerk is going to give you an oath and we

19   will swear you in.

20              ANTHONETTE STROWDER, DEFENDANT, SWORN

21                          EXAMINATION

22   Questions by The Court:

23   Q.    So Miss Strowder, we're going to proceed with a hearing

24   relative to a plea because we understand that is what you

25   would like to do.  Is that true?

1    A.      Yes, sir.

2    Q.      All right.  So you have been placed under oath and that

3    means that you have to answer truthfully all of the questions

4    that I ask you.  If you were to answer a question by giving me

5    false information willfully, the Government could bring

6    another case against you for perjury or making a false

7    statement in Court.  Do you understand that?

8    A.      Yes, sir.

9    Q.      All right.  For the record, would you tell me your full

10   name please?

11   A.      Anthonette Strowder Evans.

12   Q.      All right.  And Miss Strowder Evans, where were you

13   born?

14   A.      Centralia, Illinois.

15   Q.      And when were you born in Centralia?

16   A.      6-5-59.

17   Q.      You are how old today?

18   A.      59.

19   Q.      Ma'am, how far did you go in school?

20   A.      Two years of college.

21   Q.      Have you been treated recently for any mental illness?

22   A.      No.

23   Q.      Have you been treated recently for an addiction to

24   narcotic drugs of any kind?

25   A.      No, sir.

11

1   Q.     So at the current time you are taking, I assume, a

2   number of medications because you have a number of physical

3   ailments.  Is that a fair statement?

4   A.     Yes, sir.

5   Q.     Now with respect to these medications that you take,

6   Miss Strowder Evans, are there any of those medications that

7   cause you to be unable to have a conversation with your

8   lawyer, help your lawyer with your defense, know what is going

9   on, be aware of your surroundings?  Any of those medications

10  interfere with any of those activities?

11  A.     Sometimes with my heart medicine, it is a new medicine.

12  It kind of make me forget things sometimes.

13  Q.     All right.  And if you engage in a conversation where

14  you forget things, can you come back later and remember those

15  things?

16  A.     It will take me like a day, I remember.  Like he asked

17  me that question and I didn't know what to answer else, but

18  that is what it is.  I have to think about it.

19  Q.     So there has been a time when you were -- maybe that is

20  what you were just talking about.  Has there been a time when

21  you were talking with Mr. Humphrey where you couldn't remember

22  what he needed to know?

23  A.     Yeah, I done asked him stuff that I forgot.

24  Q.     Were you able to work it out and come to some

25  conclusions?

1    A.    Yes, sir.

2    Q.    Do you feel there is any reason at all why the drugs

3    interfere with you being able to conduct our hearing today?

4    A.    No.  I'm just sick, sir.

5         THE COURT:  Okay.  Mr. Humphrey, I have noted that

6    you were conversing with your client from time to time.  Any

7    reason that you know of we should not proceed with this guilty

8    plea?

9         MR. HUMPHREY:  No, Your Honor.

10   Questions By The Court:

11   Q.    Miss Strowder Evans, there has been an Indictment

12   handed down against you by the grand jury and then that was

13   amended and a Superseding Indictment was entered on

14   December 5th of 2017.  Are you familiar with the Indictment?

15   A.    I am now.  At first I wasn't, sir, until my attorney

16   told me about it.

17   Q.    Okay.  Did you not see the Superseding Indictment ever?

18   A.    No.  The attorney that I had at first told me it was

19   something else that I signed for.  I never seen it until he

20   explained it to -- my attorney now explained to me what I had

21   signed.

22   Q.    Do you understand what you have been charged with?

23   A.    I understand I was charged with crystal meth.  Then

24   they brought in an Indictment on crack cocaine.

25   Q.    Let me read to you just the basic charges.

1          Count 1 charges conspiracy to distribute

2   methamphetamine.  Count 2 charges possession with intent to

3   distribute methamphetamine.  Count 3 charges you with

4   distribution of methamphetamine.  Let me go back to Count 2,

5   the possession with intent to distribute methamphetamine.

6   That is alleged to have occurred on or about June 15th of

7   2017.  Count 3, distribution of methamphetamine, alleged to

8   have occurred on or about June 13th of 2017.  Count 4 charges

9   you with distribution of methamphetamine said or alleged to

10  have occurred on or about June 14th of 2017.  Count 5,

11  distribution of cocaine, alleged to have occurred on or about

12  November 18th of 2014.  Count 6, distribution of cocaine,

13  alleged to have occurred on or about November 18th of 2014.

14  And then the last one, Count 7, distribution of cocaine,

15  alleged to have occurred on or about November 21st of 2014.

16          Are you familiar with those charges based on your

17  conversation with Mr. Humphrey?

18  A.    Well, we talked about it, but I explained to him that I

19  was not familiar with no crystal meth charges, none

20  whatsoever, but I had friends that I was around done that

21  smoking crack.

22          THE COURT:  So Mr. Norwood, I don't see in the

23  allegations, the allegation of actual or pure meth or what is

24  known as Ice.  Do any of these allegations contemplate that?

25          MR. NORWOOD:  No, Your Honor, they contemplate a

1   mixture and substance containing methamphetamine.

2   Questions By The Court:

3   Q.      All right, so you are not charged in any of these

4   counts with the distribution or possession of ice, what you

5   are calling, I think, crystal meth.  That is not what you are

6   charged with.  Would you like me to actually read the charges

7   to you?

8   A.      Yes, I would like to know what I am charged with.

9   Q.      All right.  Have you gone over this with Mr. Humphrey?

10  A.      Yes.

11  Q.      Did you ever appear before a Magistrate Judge to go

12  over the charges?

13  A.      No, this is my first appearance in front of the Judge.

14  Q.      Do you remember there was a time when the ambulance

15  stayed out in the parking lot and the Judge came out and

16  conducted a hearing with you?

17  A.      But they never honestly -- you told me to be honest,

18  right?

19  Q.      That's right.

20  A.      When they brought me over here, they said that the Feds

21  wanted to talk to me.  They never said I was going to Court or

22  nothing.  They said the Feds wanted to talk to me, brought me

23  over here, had me in an ambulance, had me to sign some paper

24  and they came out.  Honestly, I was not in my right state of

25  mind.  I had no clue what was going on, sir.  I was sicker

1    than I am now, so they kind of caught me off guard.

2         THE COURT:  Mr. Humphrey, you want to address

3    something?

4         MR. HUMPHREY:  Just to clarify, Miss Strowder was

5    brought in originally on the Indictment and she did have an

6    arraignment.  Once the Superseding Indictment came down, I

7    believe it was last year on this date, she was scheduled for

8    an arraignment on the Superseding Indictment in front of Judge

9    Williams.  Before the hearing was held, Miss Strowder signed a

10   Waiver of Arraignment on the Superseding Indictment, which was

11   filed by her previous attorney, so she did not appear in front

12   of Judge Williams for arraignment on the Superseding

13   Indictment.

14   Questions By The Court:

15   Q.    Okay.  So let me then, at your request, Miss Strowder,

16   let me go ahead and read this Indictment to you.  I am going

17   to read all of the counts.  I understand that you are not

18   pleading guilty to all of the counts.  Let me go ahead and

19   read all of them nonetheless.

20        The style of the case is United States of America

21   versus Anthonette Strowder, 17-CR-30120-DRH, Superseding

22   Indictment.  The grand jury charges in Count 1, conspiracy to

23   distribute methamphetamine.  Are you able to hear me okay?

24   A.    Am I what?

25   Q.    Able to hear me okay?

1   A.      Yes, sir.

2   Q.      All right.  So Count 1, conspiracy to distribute

3   methamphetamine from on or about January of 2016 until on or

4   about June 15th of 2017 in Marion County within the Southern

5   District of Illinois and elsewhere, Anthonette Strowder, aka

6   Big Mama, defendant herein, did knowingly combine, conspire

7   and agree with others, known and unknown to the grand jury, to

8   knowingly and intentionally distribute methamphetamine, a

9   Schedule II controlled substance, in violation of Title 21,

10  United States Code, Section 841(a)(1), all in violation of

11  Title 21, United States Code, Section 846.  It is further

12  alleged that the total amount of mixture and substance

13  containing methamphetamine involved in the conspiracy was

14  50 grams or more of methamphetamine.  That does say (Ice) or

15  500 grams or more of a mixture and substance containing a

16  detectable amount of methamphetamine punishable pursuant to

17  provisions of Title 21, United States Code, Section

18  841(b)(1)(A).

19          Count 2, possession with intent to distribute

20  methamphetamine.  On or about June 15th of 2017 in Marion

21  County  within the Southern District of Illinois, Anthonette

22  Strowder, aka, Big Mama, defendant herein, did knowingly and

23  intentionally possess with intent to distribute a mixture or

24  substance containing a detectable amount of methamphetamine, a

25  Schedule II controlled substance, in violation of Title 21,

17

1    United States Code, 841(a)(1).  It is further alleged that the

2    total amount of mixture and substance containing

3    methamphetamine possessed by defendant was five grams or more

4    of methamphetamine (Ice) or 50 grams or more of a mixture and

5    substance containing a detectable amount of methamphetamine

6    punishable pursuant to the provision of Title 21, United

7    States Code, Section 841(b)(1)(B).

8            Count 3, distribution of methamphetamine on or about

9    June 13th of 2017 in Marion County within the Southern

10   District of Illinois, Anthonette Strowder, aka Big Mama,

11   defendant herein, did knowingly and intentionally distribute a

12   mixture or substance containing a detectable amount of

13   methamphetamine, Schedule II controlled substance, in

14   violation of Title 21, United States Code, Section 841(a)(1)

15   and 841(b)(1)(C).

16           Count 4, distribution of methamphetamine.  On or

17   about June 14th in Marion County within the Southern District

18   of Illinois, Anthonette Strowder, aka Big Mama, defendant

19   herein, did knowingly and intentionally distribute a mixture

20   or substance containing a detectable amount of

21   methamphetamine, a Schedule II controlled substance, in

22   violation of Title 21, United States Code, Section 841(a)(1),

23   841(b)(1)(C).

24           Count 5, distribution of cocaine on or about

25   November 18th of 2014 at approximately 12:10 p.m. in Marion

18

County within the Southern District of Illinois, Anthonette
Strowder, aka Big Mama, defendant herein, did knowingly or
intentionally distribute a mixture or substance containing a
detectable amount of cocaine, a Schedule II controlled
substance, in violation of Title 21, United States Code,
Section 841(a)(1), 841(b)(1)(C).

Count 6, distribution of cocaine on or about
November 18, 2014, at approximately 1:00 p.m. in Marion County
within the Southern District of Illinois, Anthonette Strowder,
aka Big Mama, defendant herein, did knowingly and
intentionally distribute a mixture or substance containing a
detectable amount of cocaine, a Schedule II controlled
substance, in violation of Title 21, United States Code,
841(a)(1) and 841(b)(1)(C).

Count 7, distribution of cocaine on or about
November 21, 2014, in Marion County, within the Southern
District of Illinois, Anthonette Strowder, aka Big Mama,
defendant herein, did knowingly and intentionally distribute a
mixture or substance containing a detectable amount of
cocaine, Schedule II controlled substance, in violation of
Title 21, United States Code, Section 841(a)(1) and
841(b)(1)(C).

It is signed by the foreperson and also signed by a
person on behalf of the United States Attorney, who at that
time was Donald Boyce.  Also signed off on by George Norwood,

1    the Assistant U.S. Attorney.

2         So Miss Strowder, do you understand the charges

3    contained in this Superseding Indictment?

4    A.    Only part.  I don't understand what is distribute, the

5    part distribute mean.

6    Q.    Distribute -- in other words, transfer from one person

7    to another.

8    A.    Like from my hand to your hand?

9    Q.    Need not be hand to hand, but just some sort of

10   transfer where the drugs are in your possession and then you

11   arrange for them to be in somebody else's possession.

12   A.    Never did that.

13   Q.    Do you understand the charge?

14   A.    I understand what you're saying now.

15   Q.    All right.  So I understand that it is your desire to

16   plead guilty to Counts 2, 3, 4, 5, 6, 7, but not Count 1, is

17   that correct?

18   A.    Yes.

19   Q.    Okay.  Miss Strowder, looking there at your lawyer,

20   Mr. Humphrey, are you satisfied completely and thoroughly with

21   the work he has been doing for you as your lawyer?

22   A.    Honestly, yes.

23        THE COURT:  All right.  So Mr. Humphrey, were all

24   plea offers, formal plea offers by the Government, conveyed to

25   Miss Strowder?

20

1      MR. HUMPHREY:  Yes, Your Honor.  We just had a plea

2   negotiation this morning and it was relayed to Miss Strowder.

3      THE COURT:  That is the only plea negotiation that

4   you are aware of?

5      MR. HUMPHREY:  Involving me, Your Honor, yes.

6      THE COURT:  All right.

7   Questions By The Court:

8   Q.    Miss Strowder, has anyone attempted in any way to force

9   you to plead guilty?

10  A.    You mean now?

11  Q.    Yes.

12  A.    Not now, no.

13  Q.    Has anyone threatened you to get you to plead guilty

14  now?

15  A.    No.

16  Q.    Aside from agreeing to dismiss Count 1, has anyone made

17  any other promises or assurances to you in order to get you to

18  plead guilty now?

19  A.    Not today, no.

20  Q.    Are you pleading guilty of your own free will, Miss

21  Strowder, because you know you are guilty?

22  A.    Yes, sir.

23  Q.    So what is charged in Counts 2 through 7 are felony

24  offenses.  That means if, in fact, you do plead guilty to

25  those charges and I accept your plea, you may be deprived of

21

1   certain valuable civil rights like the right to vote, hold

2   public office, serve on a jury and possess any kind of

3   firearm.  Do you understand that?

4   A.    Yes, sir.

5   Q.    All right.  So the potential penalties from a statutory

6   standpoint are as follows:  With regard to Count 2, which is

7   the possession with intent to distribute methamphetamine, the

8   minimum and maximum possible penalties from a statutory

9   standpoint, five years minimum and 40 years maximum, up to

10  $5,000,000 fine, supervised release of not less than four

11  years in addition to $100 special assessment.

12          As to Counts 3 and 4, distribution of

13  methamphetamine, the maximum possible statutory penalty is up

14  to 20 years imprisonment, up to a million dollars fine,

15  supervised release of not less than three years.

16          Mr. Norwood, I just noted that my file doesn't have

17  the second page of the cover sheet, so what are the potential

18  penalties for Counts 5, 6 and 7?

19          MR. NORWOOD:  Your Honor, they are the same as for

20  Counts 3 and 4.  The penalties are up to 20 years

21  imprisonment, up to a million dollars fine, not less than

22  three years supervised release.

23          THE COURT:  All right.

24  Questions By The Court:

25  Q.    Plus the $100 special assessment.  So do you understand

22

1    those are the potential minimums and maximums of the counts to

2    which you are suggesting that you plead guilty to?

3    A.     Yes, sir.

4    Q.     All right.  Now this concept of supervised rerelease, I

5    said with each of the counts there is a required amount of

6    supervision after incarceration.  The way supervision works is

7    at the time of sentencing the Judge will enter an order

8    advising you that or telling you that you have to comply with

9    certain conditions of supervision.  If you were to violate the

10   conditions of your supervision, your supervision could be

11   revoked and you could be required to return to prison.  You

12   understand that?

13   A.     Yes, sir.

14   Q.     Okay.  Now have you and Mr. Humphrey at any time talked

15   about the sentencing guidelines that are in effect in the

16   Federal system?

17   A.     Yes.

18   Q.     Do you understand that those guidelines are advisory,

19   correct?

20   A.     Yes, sir.

21   Q.     And you understand that that means that when we

22   determine at the time of sentencing what your guideline range

23   is, which I don't know now because I haven't made that

24   determination, but when we correctly calculate the guidelines,

25   the sentencing Judge would have the option of either abiding

23

1    by agreeing with the advice of the Sentencing Commission, but

2    could reject their advice and impose something different,

3    either less than or greater than, as long as the Judge stays

4    within the parameters of the statutory penalties.  Do you

5    understand that?

6    A.      Yes, sir.

7    Q.      So at sentencing, after the correct calculation of the

8    guidelines, the Judge would then examine the sentencing

9    statute, the sentencing factors contained within the statute,

10   in order to make a decision about whether to follow the

11   guidelines or to reject them and impose a different sentence.

12   Do you understand that as well?

13   A.      Yes, sir.

14   Q.      Do you have any questions about that?

15   A.      No.

16   Q.      All right.  So please understand that you have certain

17   rights that you possess as you sit there now.  Those rights

18   are that you have the right to plead not guilty to any of

19   these offenses, Counts 1 through 7 charged against you, and to

20   persist in that plea.

21          You have the right to a trial by jury.  At trial you

22   would be presumed to be innocent and the Government would have

23   to prove your guilt beyond a reasonable doubt.

24          You would have the right to the assistance of counsel

25   for your defense, appointed by the Court if necessary, at

24

1    trial and every other stage of the proceeding.

2           You have the right to see and hear all of the

3    witnesses and have them cross-examined in your defense.

4           You have the right on your own part to decline to

5    testify unless you voluntarily elected to do so in your own

6    defense, and the right to compel the attendance of witnesses

7    to testify in your defense.  If you were to go to trial and

8    decided not to testify yourself or even put on any evidence

9    whatsoever, the jury would be instructed they could not hold

10   those things against you.

11          Do you understand you have all of those rights,

12   ma'am?

13   A.     I do now.

14   Q.     But do you understand further, Miss Strowder, that by

15   entering a plea of guilty, if I accept that plea, there will

16   be no trial, you will have waived or given up your right to

17   trial as well as all of the other rights associated with the

18   trial which I have just described.  Do you understand that?

19   A.     Yes, sir.

20   Q.     Okay.  So there are certain facts the Government has to

21   prove in order to establish the essential elements of each of

22   the offenses.  I am going to ask Mr. Norwood to advise us of

23   the elements necessary for each of these offenses and then to

24   recite for the record the facts the Government believes would

25   be proved at trial if the case were to go to trial.

1    Mr. Norwood?

2         MR. NORWOOD:  Your Honor, with respect to Count 2,

3    the possession with intent to distribute methamphetamine

4    count, the Government would have to show that Miss Strowder

5    did knowingly and intentionally possess a mixture and

6    substance containing methamphetamine, that she intended to

7    distribute some of that methamphetamine, and that she knew

8    that the substance was a controlled substance.

9         The evidence with respect to Count 2 would be that on

10   June 15th of 2017 at her residence in Centralia, Illinois,

11   which is within Marion County, Illinois, law enforcement

12   officers executed a search warrant.  Miss Strowder was in her

13   bed at the time of the search warrant.  Law enforcement

14   officers located in her lap or right there on the bed with her

15   a yellow handbag and inside of the yellow handbag there was

16   approximately 54 grams of a mixture and substance containing

17   methamphetamine that has been sent to the Illinois State

18   Police crime lab and confirmed as methamphetamine, as

19   containing methamphetamine.  In addition, an individual tried

20   to flush something down the toilet.  That item was recovered

21   and there was approximately five more grams of

22   methamphetamine.  We would show that also in this backpack was

23   a large sum of currency, approximately $1,300 and some change.

24   We would show that Miss Strowder intended on distributing some

25   of the methamphetamine that was recovered in her residence

1    that day.  That would be the evidence we would have, among

2    other things, on Count 2.

3             With respects to Counts 3, 4, 5, 6 and 7, the

4    elements are the same with respect to each of the counts.  The

5    Government would have to prove that the defendant, Miss

6    Strowder, knowingly and intentionally distributed a controlled

7    substance and that the defendant knew that it was a controlled

8    substance.

9             With respect to Count 3 we would show that on

10   June 13th of 2017 at a residence in Centralia, Illinois, which

11   is within Marion County, Miss Strowder sold a mixture and

12   substance containing methamphetamine to a confidential source

13   who was working for law enforcement at that time.  We would

14   show that she provided the confidential source with the

15   methamphetamine and that the confidential source later turned

16   that methamphetamine over to law enforcement and indicated

17   that she had provided it to him.  This was done as part of a

18   controlled purchase.  We would also show with respect to that

19   particular count that of the money found in Miss Strowder's

20   backpack on June 15th, there was a $20 bill that the

21   confidential source used to make that purchase on June 13th of

22   2017 that was premarked and copied by law enforcement and that

23   was still in her possession.

24            With respect to Count 4, the distribution of

25   methamphetamine, we would show that on June 14th of 2017 at

1   her residence in Centralia, Illinois, which is within Marion

2   County, Illinois, that Miss Strowder knowingly and

3   intentionally distributed a mixture and substance containing

4   methamphetamine to a confidential source working for law

5   enforcement.  This transaction was recorded with video showing

6   the distribution and the confidential source then provided the

7   methamphetamine to law enforcement officers.

8            In both Counts 3 and 4 the substances were taken to

9   the State Police crime lab and determined to contain

10  methamphetamine.

11           With respect to Count 5, we would show that on

12  November 18th of 2014 at approximately 12:10 p.m. at Miss

13  Strowder's residence in Centralia, Illinois, within Marion

14  County, Illinois, Miss Strowder knowingly and intentionally

15  distributed a mixture and substance containing cocaine to a

16  confidential source working for law enforcement.  That

17  transaction was both video and audio recorded.  The substance

18  was taken to the State Police crime lab and confirmed as

19  having cocaine.  The confidential source provided that

20  substance to law enforcement after the transaction.

21           With respect to Count 6, we would show that on or

22  about November 18th of 2014 at approximately 1:00 p.m. at Miss

23  Strowder's residence in Centralia, Illinois, within Marion

24  County, Illinois, on that date and time Miss Strowder did

25  knowingly and intentionally distribute a mixture and substance

1   containing a detectable amount of cocaine to a confidential

2   source working for law enforcement.  That transaction was

3   video taped and audio taped.  The substance was taken to the

4   crime, excuse me, the State Police crime lab and determined to

5   contain cocaine.

6           With respect to Count 7, we would show that on or

7   about November 21st of 2014 at Miss Strowder's residence in

8   Centralia, Illinois, within Marion County, Illinois, Miss

9   Strowder did knowingly and intentionally distribute a mixture

10   and substance containing cocaine to a confidential source

11   working for law enforcement.  That transaction was video and

12   audio taped.  The substance was taken to the State Police

13   crime lab and determined to contain cocaine.

14           We would show with respect to all Counts 2 through 7

15   that the defendant knew that the substance involved was a

16   controlled substance and we would show that Marion County,

17   Illinois, is within the Southern District of Illinois.

18           THE COURT:  So, sir, if I understand you correctly,

19   in all of Counts 2 through 7, there was either a controlled

20   buy, confidential informant who made the purchase, or there

21   was a search, and in like three of the counts, 5 through 7,

22   there was video and audio recording of each of the sales?

23           MR. NORWOOD:  Yes, Your Honor.  On Count 4 there was

24   also video, but not audio.

25           THE COURT:  Thank you.

29

1   Questions By The Court:

2   Q.     Miss Strowder, after listening to all of the things

3   Mr. Norwood just said about the charges against you in Counts

4   2 through 7 with respect to what the Government would have to

5   prove for each of the counts and what the evidence that would

6   be produced at trial would show, do you have, first of all,

7   any questions about any of those things?

8   A.     Yeah, I really do.

9   Q.     What is that?

10  A.     Because I never seen no videos of no crystal meth.  I

11  seen videos of crack cocaine, but I ain't never seen no videos

12  of no crystal meth.

13        THE COURT:  I don't think Mr. Norwood mentioned there

14  was video of a crystal meth transaction.  Am I right about

15  that Mr. Norwood?

16        MR. NORWOOD:  With respect to Count 4, there was a

17  video of a transaction.  There was no audio.  With respect to

18  Count 3, there was no video.

19        THE COURT:  All right.  So was there a video that

20  involved the transaction of crystal meth or Ice?

21        MR. NORWOOD:  We did not have a purity testing done

22  of the substance, but we did have the State Police crime lab

23  confirm it did contain methamphetamine.  That is why we're not

24  saying it is crystal meth.

25

1  Questions By The Court:

2  Q.    What he is saying, Miss Strowder, is that they did not

3  make any testing or have any testing to determine whether any

4  of methamphetamine was Ice.  They are just saying that you're

5  accountable for substances containing methamphetamine on each

6  of those occasions.  Do you understand what I am saying?

7  A.    Yes.

8  Q.    So Ice is not something you have to be concerned about,

9  in other words.  I see that Mr. Humphreys just talked to you.

10 Do you have any questions after my comments or Mr. Humphrey's

11 comments to you?

12 A.    No, sir.

13 Q.    Do you still feel as though the Government could prove

14 you guilty in each of the counts?

15 A.    Yes.

16 Q.    All right.  Is there anything that we have done and do

17 you believe you understand all of the consequence of entering

18 into a plea of guilty?

19 A.    Yes, sir.

20 Q.    Is there anything we talked about or anything that we

21 have done that you have some question about or did not

22 understand?

23 A.    No.

24 Q.    Did you understand everything we did?  Is that a yes?

25 A.    Yes.

1   Q.     Okay.  Have you changed your mind about pleading

2   guilty?

3   A.     No, sir.

4   Q.     All right.  So Miss Strowder, how do you plead to the

5   charges contained in Counts 2, 3, 4, 5, 6, 7; guilty or not

6   guilty?

7   A.     Guilty.

8          THE COURT:  It is finding then of the Court in the

9   case of United States of America versus Anthonette Strowder

10   that the defendant is fully competent and capable of entering

11   an informed plea, that the defendant is aware of the nature of

12   the charges and the consequences of the plea, that the plea of

13   guilty is a knowing and voluntary plea supported by an

14   independent basis in fact containing each of the essential

15   elements of the offense.  The plea is, therefore, accepted and

16   the defendant is now adjudged guilty of each of the offenses

17   in Counts 2, 3, 4, 5, 6 and 7.

18   Questions By The Court:

19   Q.     So Miss Strowder, at this point I would direct the

20   Probation Office to conduct a presentence investigation.  At

21   some point they will want to -- the probation officer will

22   want to talk to you.  You ought to have Mr. Humphrey present

23   with you if that is possible.

24   A.     Yes, sir.

25   Q.     The result of that presentence investigation will be a

32

1   very thorough report that Mr. Humphrey will see to it you get

2   a copy of and you should take the time to read through it

3   carefully and thoroughly and tell Mr. Humphrey if you find

4   anything in there that you think is not accurate, something

5   that is just not the case, the truth, and let him work with

6   Probation to try to change that.

7          Then at the time of the sentencing, the first thing

8   that is done in the sentencing hearing is to make a

9   determination as to whether or not the findings in the

10  probation report is true and then make a calculation of your

11  guideline, then go on with sentencing.  Do you have any

12  questions about any of that?

13  A.     No, sir.

14         THE COURT:  Lisa or Alex, do we know who the Judge is

15  going to be?

16         COURTROOM CLERK:  Yes, it is Judge Rosenstengel.

17         THE COURT:  Judge Rosenstengel will be the sentencing

18  Judge.  Did they give us a date?

19         COURTROOM CLERK:  March 4th of 2019, 1:30.

20         THE COURT:  March 4th of 2019 at 1:30.

21         Now currently Miss Strowder is out on bond and we had

22  a discussion off the record so that I know that Mr. Norwood at

23  this point is pressing for the defendant to be detained

24  pending sentencing and Mr. Humphrey, your argument pleads

25  against detention.

1          MR. HUMPHREY:  That's correct, Your Honor.

2          Your Honor, obviously, in this situation Miss

3    Strowder is clearly not a flight risk.  We just know from

4    today the difficulty that she has in moving around and the

5    arrangements that have to be made for her to even get in her

6    vehicle.  She is currently suffering from emphysema, COPD and

7    she has a heart condition as well.  These conditions are all

8    exacerbated by Miss Strowder's weight.  Currently while she is

9    at home, she is receiving the care that is necessary for her.

10   We had an incident even earlier today as far as her oxygen was

11   concerned.  At home she has an oxygen machine where she

12   doesn't need the switching of the tanks.  She also has the

13   assistance of her niece here with her today as well as, I

14   believe, her daughter-in-law, who is a nurse, who comes by to

15   make sure that Miss Strowder is cared for.  To be blunt, Your

16   Honor, Miss Strowder said to me that she is honestly concerned

17   that she is not going to live very long and she is just

18   requesting to remain out on bond until sentencing to spend

19   whatever time she has remaining with her family and I think

20   that she does have very, very severe health issues that are

21   currently being properly addressed at home.  To take her into

22   custody right now, we're taking her out of that comfort zone,

23   but in addition not knowing if the facilities can actually

24   give her the arrangements that she needs to take care of her

25   various issues.

34

1          THE COURT:  Mr. Norwood?

2          MR. NORWOOD:  The Government's position is detention

3     is appropriate in this case.  The Government understands the

4     concerns regarding her health that were raised by defense

5     counsel, but the Government believes that detention still

6     remains appropriate.  While the Government is not

7     unsympathetic to that, the Government has a duty to protect

8     the public.

9          The Government's basis for that is a couple of

10    things.  One, I did check my notes for some of her prior

11    criminal history.  According to my notes, she has at least

12    eleven prior felony convictions, many of those or most of

13    those for which she served time or was sentenced to time in

14    the Illinois Department of Corrections.  Of importance, most

15    of those were forgery, retail thefts, misuse of credit card,

16    but there were -- one was felon in possession of a firearm in

17    1992, '92 case out of Marion County.  One was a '97 case for

18    failure to return from furlough.  One was a 2005 Jefferson

19    County case for failure to return from furlough.

20         So the Government wants the Court to know a little

21    bit about her criminal history.  She does have extensive

22    criminal history.  In addition, the Government believes that

23    it has evidence and would have produced that evidence at trial

24    on a couple of things.  One, that since she has been out on

25    bond, the defendant has continued to sell drugs and we have

1    several instances of that.  The Government believes that

2    continued up until at least August of this year.  In addition,

3    in doing trial preparation for this case, the Government has

4    information that the defendant has contacted at least one of

5    the witnesses against her.  That would be a confidential

6    source who made some of the purchases that were charged in the

7    Superseding Indictment, and she wanted to contact that person

8    and talk to that individual in person.  That was just within

9    the last week, so the Government has concerns in that regard

10   also.  The Government believes that detention is appropriate.

11   The Government understands the significance of its

12   recommendation, given Miss Strowder's condition, but still

13   believes it is important and imperative that she be detained

14   for the safety of the community.

15          THE COURT:  Thank you, Mr. Norwood.

16          Mr. Humphrey, I understand it is the Government's

17   burden.  By my coming back to you, it is not that I have

18   shifted that burden.  I just want to give you an additional

19   opportunity to address the matters discussed by Mr. Norwood if

20   you care to.

21          MR. HUMPHREY:  Yes, I do, Your Honor.

22          Obviously, Miss Strowder's criminal history, it is

23   what it is.  In referencing many of the things that happened

24   in the early '90s, we're talking about a significantly

25   different circumstance of this individual.  She is no longer

36

1    capable of, quite frankly, doing any of those things.  She is

2    bedridden, can't move around, so as far as being any potential

3    harm to the community, she is going to be in her bed, period.

4    Pointblank, she is not going anywhere.

5         Additionally, Your Honor, as far as any allegations

6    about continued drug dealings, these accusations -- these are,

7    quite frankly, accusations that I have heard for the first

8    time today.  This is something that, obviously, if there was

9    information about this, someone could have moved before today

10   for removal of Miss Strowder from bond before now.  So from

11   the standpoint of her doing any sort of continued illegal

12   activity, Miss Strowder is 100 percent on notice right now.

13   If she does anything, anything remotely wrong, she is going

14   into custody.  She knows it.  Everyone is going to be watching

15   her probably more closely than they have been up to this

16   point.  If she does anything, I'll not be able to come to you

17   and say to you, well, give Miss Strowder a second chance.  She

18   messes up, she is going into custody.  I think that is

19   strictly on Miss Strowder.  I think that she takes it

20   seriously.  Knowing about her circumstances, wanting to be

21   around her family, she will not put herself in any jeopardy to

22   run afoul of the law.

23        Just in general, I don't have any reports or anything

24   to more specifically address the issues of Mr. Norwood.  That

25   is what I would argue in rebuttal to what he had to say.

37

1          THE COURT:  So one of the options available, if she

2     were to be detained, is in Richland County.  Is your case

3     agent from Richland County?

4          MR. NORWOOD:  Yes, he is.

5          THE COURT:  Is he able to address the issue of how

6     Richland County might provide for her medical care?

7          MR. NORWOOD:  Yes, Your Honor.  Would you like to

8     speak to him directly?

9          THE COURT:  Please.  For the record, state your name

10    and tell me what the plan would be if she were to be detained.

11         CAPTAIN BURTON:  My name is Captain Mike Burton.  I

12    work for the Richland County Sheriff's office.

13         Right now we have what I would call a large dorm

14    cell, normally used to house multiple people.  It has the most

15    room.  We have contacted Williams Brothers Pharmacy for a

16    bariatric bed that would be brought in, put together in that

17    cell.  We have a nurse practitioner that is on staff.  We have

18    talked to her.  She would be on call 24/7.  She also visits

19    the jail twice a week and we were also looking at CNA staffing

20    24/7 for round the clock for that.

21         THE COURT:  All right, thanks.  Mr. Norwood, anything

22    else you want to address?

23         MR. NORWOOD:  There were two things.  One, I know the

24    Court mentioned the burden.  I think the law says once

25    somebody is convicted of a crime like this they will be

1    detained unless there are extraordinary circumstances.

2          THE COURT:  I understand.

3          MR. NORWOOD:  Second, Mr. Humphrey indicated if the

4    Government knew of drug dealing we would have filed a Motion

5    to Detain before this.  He is unaware there was an ex parte

6    Motion to Revoke filed earlier this year, either in January or

7    February of this year, and Magistrate Judge Wilkerson granted

8    the motion initially and the marshals tried to find somewhere

9    to house her.  They were unable to find somewhere to house

10   her, so they set up the visitation by Probation and Marshals

11   twice a week instead because at that point there was nowhere

12   to house her.  We do now have a place to house her.

13         THE COURT:  Okay.  Mr. Humphrey, anything else?

14         MR. HUMPHREY:  No, Your Honor.

15         THE COURT:  Okay.  So I agree with Mr. Humphrey that

16   the defendant is not a flight risk as an individual.  I think

17   it is clear that she could be a flight risk or is a flight

18   risk with respect to family helping her and I expressed

19   earlier in this hearing before Miss Strowder got here that one

20   concern I had was that she was not going to cooperate with

21   appearing today because she had never appeared prior to today

22   and at that point it looked like she was not going to appear

23   today.  So I think flight risk is not out of the question.

24         I think what is the more significant issue though is

25   the danger to the public with respect to the continued drug

39

1   dealing, calling witnesses, perhaps retaliating, and so that

2   is of significant concern to the Court.  Also with respect to

3   her medical care, it sounds like she has medical care now, but

4   it also sounds like, by comparison, the medical care that

5   Richland County can provide, and I suspect or I believe any

6   other facility where she might be detained, will be probably

7   not just as good, but actually better than, so it would be in

8   her interest.

9           So put all of the things together, and I agree with

10  Mr. Norwood, I misspoke.  It was his job to show extraordinary

11  circumstances, and while there are circumstances which might

12  suggest in the ordinary course that somebody with this many

13  ailments has the circumstances necessary to avoid detention,

14  but in this case, given all of the no shows, given the

15  defendant's history, given the criminal history even following

16  Indictment, that extraordinary circumstance or circumstances,

17  rather, are trumped by the concerns the Court has for flight,

18  and more importantly, the protection of the public.

19          So the defendant will be remanded and detained

20  effective at the close of the business day on Friday.  This

21  will give the Marshal Service an opportunity to make the

22  arrangements that need to be made.  It sounded like from the

23  Richland County representative that things are not all in

24  place yet, and I am not sure that is where she'll be housed.

25  In any event, they need time, I believe, to work the

40

1   arrangements.  So by no later than the close of business day

2   on Friday, Miss Strowder's bond is revoked and she will be

3   detained by the Marshal Service pending sentencing.  Between

4   now and that time she will be -- she will have to continue to

5   follow the conditions of her bond and the bond is revoked

6   effective upon the Marshal Service making the arrangements to

7   pick her up.  Anything else Mr. Norwood?

8            MR. NORWOOD:  Not on behalf of the Government.

9            THE COURT:  Anything else Mr. Humphrey?

10           MR. HUMPHREY:  No, Your Honor.

11           THE COURT:  So do you need a formal or written order

12   from me to effectuate this?

13           MARSHAL:  No, Your Honor.

14           THE COURT:  If there is nothing else, we'll be

15   adjourned.

16           MR. HUMPHREY:  Your Honor --

17           THE COURT:  Hold on.

18           MR. HUMPHREY:  Miss Strowder has informed me it is

19   her desire to take her plea back.

20           THE COURT:  Well, Judge Rosenstengel can set that in

21   the future.  Motion denied.

22           (Court is adjourned.)

23

24           I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

25   SS/Barbara Kniepmann                    April 25, 2019