1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3    UNITED STATES OF AMERICA,        )
                                      )
4                    Plaintiff,       )
                                      )
5         vs.                         ) No. 17-cr-30120-DRH
                                      )
6    ANTHONETTE STROWDER,             )
                                      ) March 12, 2019
7                    Defendant.       )

8

9                      TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
10              UNITED STATES DISTRICT COURT JUDGE

                           APPEARANCES
11

     **FOR PLAINTIFF:**           George A. Norwood, Esq.
12                                Assistant U.S. Attorney
                                  402 West Main St.
13                                Benton, IL  62812
                                  (618) 439-3808
14

15   **FOR DEFENDANT:**           Preston Humphrey, Jr., Esq.
                                  Attorney at Law
16                                1015 Locust, Suite 413
                                  St. Louis, MO  63101
17                                (314) 621-1765

18

19

20   **REPORTED BY:**            Laura A. Esposito, RPR, CRR, CRC
                                 Official Court Reporter
21                               U.S. District Court
                                 750 Missouri Avenue
22                               East St. Louis, IL  62201
                                 (618) 482-9481
23                               Laura_Esposito@ilsd.uscourts.gov

24

25         Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

1        *(Proceedings convened in open court at 9:10 a.m.)*

2            **COURTROOM DEPUTY:**  *United States of America vs.*

3    *Anthonette Strowder*, Case No. 17-30120, is called for

4    sentencing.  Will the parties please identify themselves for

5    the record.

6            **MR. NORWOOD:**  Good morning, Your Honor.  The

7    United States is ready through George Norwood, Assistant

8    United States Attorney.

9            **THE COURT:**  Good morning, Mr. Norwood.

10           **MR. HUMPHREY:**  Good morning, Your Honor.

11   Preston Humphrey on behalf of Ms. Strowder.

12           **THE COURT:**  Good morning, Mr. Humphrey,

13   Ms. Strowder.

14           And, Mr. Norwood, who do you have with you today?

15           **MR. NORWOOD:**  Richland County Deputy Mike Burton,

16   who's the case agent.

17           **THE COURT:**  This matter is before the Court

18   today -- we are at the Western Tennessee Detention Facility

19   with a video feed to the East St. Louis courtroom.

20           Deana, can you hear me okay?

21           **COURTROOM DEPUTY:**  Yes, I can.  It's a little quiet

22   but we're able to hear.

23           **THE COURT:**  Okay.  I'll try to speak up.  My voice

24   doesn't carry very well, but -- so, there was an order

25   entered on February 25th, 2019, invoking the Federal

1    Judiciary Emergency Special Sections Act, 28 U.S.C.,

2    Section 141, and the reasons for the hearing being held here

3    are set forth in that order.

4            Now, Mr. Norwood, from the government's

5    perspective, are you ready to proceed?  Is there any reason

6    why sentence should not be imposed today?

7            **MR. NORWOOD:**  The government is ready, Your Honor.

8            **THE COURT:**  Mr. Humphrey, the same question?

9            **MR. HUMPHREY:**  We're ready to proceed, Your Honor.

10           **THE COURT:**  Okay.  I note the basis for conviction

11   in this case was a plea of guilty before Judge Herndon on

12   December 5th of 2018, without a plea agreement, to Count 2

13   of the Superseding Indictment charging possession with

14   intent to distribute methamphetamine, in Violation of 21

15   U.S.C., Section 841(a)(1); Counts 3 and 4 charging

16   distribution of methamphetamine, in violation of 21 U.S.C.,

17   Section 841(a)(1); and Counts 5, 6, and 7 charging

18   distribution of cocaine, in violation of 21 U.S.C.,

19   Section 841(a)(1).

20           Now, Mr. Norwood, it wasn't particularly clear from

21   the presentence report, but it's my understanding the

22   government is going to move to dismiss Count 1 at this time?

23           **MR. NORWOOD:**  Yes, at the end of sentencing,

24   Your Honor.

25           **THE COURT:**  Okay.  Now, I always like to start by

1    going over what I've reviewed in preparation for the

2    hearing.  Of course, the presentence report was initially

3    disclosed on January 8th of 2019, revised on February 8th.

4    The government had originally filed an objection at Document

5    110, but it was resolved by the revision to the presentence

6    report and did not impact the guideline range.

7         So, Probation did file an addendum at Doc. 111, but

8    it appears it has been resolved; is that correct,

9    Mr. Norwood?

10         **MR. NORWOOD:**  That's correct.

11         **THE COURT:**  Okay.  So, other than the presentence

12    report, that objection, and the addendum, I did not see that

13    there was anything else filed.

14         Is there anything I overlooked, Mr. Norwood?

15         **MR. NORWOOD:**  Not on behalf of the government.

16         **THE COURT:**  Mr. Humphrey?

17         **MR. HUMPHREY:**  No, Your Honor.

18         **THE COURT:**  Okay.  So, Ms. Strowder, I will ask

19    you -- I said the presentence report was disclosed on

20    January -- I think I said the wrong date -- January 25th,

21    and then revised on February 8th.  Have you reviewed that

22    report and discussed it with Mr. Humphrey?

23         **THE DEFENDANT:**  No.

24         **MR. HUMPHREY:**  We did last night.

25         **THE DEFENDANT:**  Oh, yeah, last night we did.

1    **THE COURT:**  It's a big, long 42-page report, the

2    presentence report.  Did you review that with Mr. Humphrey

3    last night?

4    **THE DEFENDANT:**  Yes, ma'am.

5    **THE COURT:**  Did you have enough time to review and

6    discuss it with him?

7    **THE DEFENDANT:**  Yes, ma'am.

8    **THE COURT:**  Okay.  Is everything in the report true

9    and accurate?

10    **THE DEFENDANT:**  To my understanding.

11    **THE COURT:**  Okay.  And within that report there are

12    proposed terms and conditions of supervision, rules

13    so-to-speak, that you would have to follow when you are

14    released.  Did you review those?

15    **THE DEFENDANT:**  Yes, ma'am.

16    **THE COURT:**  There's a justification, meaning why

17    Probation thinks it's appropriate, and an explanation,

18    meaning what it would require of you.  You went over those

19    with Mr. Humphrey?

20    **THE DEFENDANT:**  Yes, ma'am.

21    **THE COURT:**  Okay.  Now, as I said, the initial

22    objection was resolved by the revised presentence report, so

23    I will adopt the revised presentence report without

24    objection.

25    Now, I next want to review the statutory sentencing

1    option.  Count 2 calls for at least five, not more than 40

2    years of imprisonment; Counts 3 through 7 call for not more

3    than 20 years.  Supervised release under the statute on

4    Count 2 is four years to life; Counts 3 through 7, three

5    years to life.  She is ineligible for probation under the

6    statute.  The maximum fine on Count 2 is $5 million;

7    Counts 3 through 7 is $1 million.  The restitution is not an

8    issue.  There is, of course, a $100 special assessment on

9    each count, so that would be a total of $600.

10          Now, under the advisory Sentencing Guidelines, we

11   have a total offense level of 38, criminal history category

12   of 6, consisting of 31 criminal history points.  The

13   advisory guideline range on Count 2 is 360 months to life;

14   Counts 3 through 7 is 240 months, the statutory maximum.

15   Supervised release range under the guidelines is four to

16   five years on Count 2; three years on Counts 3 through 7.

17   Again, she is ineligible for probation under the guidelines.

18   The advisory fine range on Counts 2 through 7 is 50,000 to

19   $10 million, and, again, the $100 special assessment on each

20   count.

21          Now, Mr. Norwood, any objection regarding what I

22   stated with respect to the statute or the advisory guideline

23   range?

24          **MR. NORWOOD:**  No, Your Honor.

25          **THE COURT:**  Mr. Humphrey, same question?

1          *MR. HUMPHREY:*  No, Your Honor.

2          *THE COURT:*  All right.  Now, we will go off the

3   record and under seal in a separate transcript, as I do in

4   every hearing, pursuant to recommended procedure by the

5   Administrative Office.

6          Laura, this will be a separate transcript in the

7   event that it's ever ordered.

8      *(Sidebar discussion sealed by Order of the Court)*

9                         *   *   *   *

10     *(Proceedings continued in open court)*

11         *THE COURT:*  After calculating the guideline range,

12  then I must consider the relevant factors set out by

13  Congress at 18 U.S.C., Section 3553(a), and insure that I

14  impose a sentence that is sufficient but not greater than

15  necessary to comply with the purposes of sentencing.  These

16  purposes include the need for the sentence imposed to

17  reflect the seriousness of the crime, to promote respect for

18  the law, and to provide just punishment for the offense.

19  The sentence should also deter criminal conduct, protect the

20  public from further crimes by the defendant, and promote

21  rehabilitation.

22         So, Counsel, I have considered the information in

23  the revised presentence investigation report and the

24  statutory factors.  I'm now going to review those.  My

25  review of them is, at this point, regarding the nature and

1    circumstances of the offense and Ms. Strowder's history and

2    characteristics.  I will then let you both highlight

3    anything that I overlooked, elaborate on anything that you

4    wish, and give me your sentencing recommendation.

5            As to the nature and circumstances of the offense,

6    Ms. Strowder pled guilty to possession with the intent to

7    distribute methamphetamine, two counts of distribution of

8    methamphetamine, and three counts of distribution of

9    cocaine.  Her relevant conduct involved the possession with

10   the intent to distribute methamphetamine, cocaine base, and

11   cocaine, having a converted drug weight of

12   47,493.04 kilograms.

13           Additionally, according to statements made by

14   confidential sources and other witnesses, firearms were

15   often present at her residence during drug transactions,

16   including at least one incident where she exchanged two

17   firearms for methamphetamine.

18           So, under the guidelines, the base offense level is

19   36.  That's the base offense level for an amount between

20   30,000 and 90,000 kilograms of converted drug weight.  As I

21   said, hers was 47,494 kilograms.  That's calculated in

22   paragraph 37.  Let me make sure I'm saying that right.  Got

23   two different amounts.  Yes.  So, we have methamphetamine

24   converted drug weight of 47,493.04 kilograms; cocaine base,

25   called "crack," of 1.42 kilograms; and cocaine of

1    .25 kilograms.  That gives the total of 47,494.72 kilograms.

2          So then the guidelines add two levels for

3    possession of a dangerous weapon, and that brings us to 38.

4    I note that she did not receive any points for acceptance of

5    responsibility on the basis that her criminal activity

6    continued after her arrest in this case, and the government

7    prepared to go to trial.

8          So the relevant conduct time period was at least

9    October 2013 through March of 2018.  I note the presentence

10   report also reports that Ms. Strowder distributed controlled

11   substances while minor children were inside the residence.

12   Additionally, some sources indicated that she used minor

13   children to retrieve and/or package controlled substances

14   for distribution.

15         Now, looking at Ms. Strowder's history and

16   characteristics:  She's 59 years old.  She'll be 60 in June.

17   She reports having a beautiful childhood and a supportive

18   family.  She has 14 maternal half-siblings.  She was raised

19   by her maternal aunt and uncle in Centralia.  She has a

20   29-year-old son who is incarcerated in the Bureau of

21   Prisons.  She also helped to raise numerous nieces and

22   nephews.  She was raising a seven-year-old great nephew at

23   the time of her arrest.  She was married to the father of

24   her son in 1988, and her current husband, Edward Evans, in

25   2014.  He lives in Mississippi.

1          Now, Ms. Strowder has serious identified physical

2   health issues and takes a number of medications.  Those

3   conditions and medications are set forth in paragraphs 112

4   to 116 of the presentence report.  She also has suffered

5   from substance abuse issues.  She's never participated in

6   substance abuse treatment but expressed a willingness to do

7   so in the future.

8          As far as her educational background, she graduated

9   from Centralia High School in 1977.  She also took courses

10  at Kaskaskia College, completing 18 hours.  Since 2007, she

11  has received Social Security disability.

12         I note that her first criminal conviction was at

13  age 24 in 1983.  Her criminal history includes two traffic

14  convictions; one ordinance violation for dogs at large; six

15  misdemeanor convictions for retail theft; prostitution; two

16  convictions for theft; receiving stolen property; resisting

17  or obstructing; and 16 felony convictions for receipt of

18  stolen mail:  Three of those forgery, three of those escape,

19  three of those unlawful use of a weapon, retail theft,

20  theft, four convictions for that, and misuse of a credit

21  card.

22         She has spent time in state, federal, and local

23  custody.  She's had a number of terms of probation and

24  parole that have been revoked.  She's been convicted under a

25  number of names with a variety of aliases.

1          So, again, the criminal history points total 31,

2    and I note that 13 or more is Category 6, the highest

3    category under the guidelines.  She has more than double

4    what it takes to be in Category 6.

5          She also has charges pending in Milwaukee County,

6    Wisconsin and Marion County, Illinois, set forth in

7    paragraphs 71 and 72.  I note she also has 25 other arrests

8    that did not result in convictions set forth in paragraphs

9    73 to 97.

10          She was released on bond in this case on July 21st

11   of 2017.  In April of 2018, the government sought to revoke

12   her bond because of four incidents of alleged ongoing

13   criminal activity.  That was denied, and then Judge Herndon

14   ordered her to be taken into custody following her change of

15   plea.

16          So, Mr. Norwood, at this time you can make any

17   argument you wish to make about those factors and give me

18   the government's sentencing recommendation.  I would like a

19   recommendation on everything, including the fine, the length

20   of supervised release.  Wherever you're comfortable.  If you

21   want to remain seated, as long as everybody can hear you.

22          *MR. NORWOOD:*  Okay.  Thank you, Judge.

23          *THE COURT:*  I did note this on the record before,

24   but we are also by video link back to the East St. Louis

25   courtroom in order to allow anyone who wanted to attend the

1  hearing, as it is a public court proceeding, to attend.

2       So, Mr. Norwood?

3       **MR. NORWOOD:**  Yes, Your Honor.

4       As I was reviewing this case -- and Your Honor

5  highlighted a lot of things I was going to say, so I'm going

6  to try to be as brief as possible.

7       When I was reviewing this, I looked at the 3553(a)

8  factors, and I looked at them in a different light than I

9  normally do.  I normally look at them in the light of, what

10 can I say in aggravation based on these factors to support a

11 sentence within the range?  In this case, I was thinking, is

12 there any factor that would allow for a recommendation below

13 the guideline range?  Is there any factor that goes in her

14 favor?  Is there anything that the government can recommend

15 that would be somehow mitigating?  And the government could

16 not find any.

17      I went -- when I looked -- you've already talked

18 about the seriousness of the offense, and Your Honor's been

19 around many years and has noticed what drugs -- both

20 methamphetamine, crack cocaine, cocaine -- have done in

21 Southern Illinois and done to families in Southern Illinois,

22 done to addicts in Southern Illinois.  And I will note for

23 the record, it does not appear that Ms. Strowder is an

24 addict to the drugs to which she was distributing.  It says

25 she used marijuana but she did not -- there's no indication

1    she used the methamphetamine or the cocaine.  But I was

2    thinking the seriousness of the events.

3           When you look at the factors -- promote respect for

4    the law, provide just punishment, adequate deterrence, and

5    to protect the public from future harms of the defendant --

6    they all go against the defendant and do not mitigate in any

7    way the guideline range or require a below guideline

8    sentence.  None of these factors are in her favor.  You look

9    at her conduct over the entire time -- and you've talked

10   about kids being involved in this case.  That's in the

11   presentence report.  I mean that's abhorrent.  It's one

12   thing to have grown adults who can make their own mind what

13   to do.

14          I think it's particularly ironic in this case,

15   because I believe it was paragraph 104 of the presentence

16   report in this case where Ms. Strowder indicated that she

17   regretted visiting her biological mother in Wisconsin as it

18   was the first time she was exposed to the drug lifestyle and

19   that her mother was a drug dealer.  So she regrets being

20   exposed to the drug lifestyle, yet she is exposing children

21   to that very lifestyle which she regrets having gotten

22   started in.  So that is something the guidelines don't

23   calculate, the effect that she has on other people,

24   including kids.

25          Her conduct on bond, obviously that's accounted for

 1   her not receiving acceptance of responsibility.  There is

 2   one thing I would say.  The motion to revoke was actually

 3   granted by the Court, by Magistrate Judge Wilkerson, but

 4   what happened was the marshals at that time did not have a

 5   place to house her, so Magistrate Judge Wilkerson then

 6   changed it to basically put her on house arrest, and the

 7   marshals and Probation would go to her house twice a week to

 8   check up on her.  It was actually granted, but because of

 9   housing, the housing problems we're facing, it was

10   subsequently withdrawn.

11        But her conduct on bond -- she was selling drugs;

12   not only selling drugs, but using marijuana on bond

13   literally the entire time.  And there was even mention -- I

14   think it was mentioned in here where she was -- even in the

15   hospital she was -- individual purchased methamphetamine

16   while she was in the hospital from her at the hospital.  So

17   she's in the hospital for serious medical conditions but,

18   yet, still engaged in the distribution of methamphetamine.

19        **THE COURT:**  What paragraph are you referring to?

20        **MR. NORWOOD:**  That is paragraph 29, and I'm

21   referring to the last sentence on page 10 where it says [as

22   read]: R.S. also reported that when the defendant was in the

23   hospital he purchased methamphetamine from her at the

24   hospital and from her brother at her residence.

25        So, there was nothing -- not even medical

1   conditions, not even hospitalization -- that prevented her

2   from continuing her activity of selling drugs.

3          When you look at the criminal history in this case,

4   you already mentioned 31 criminal history points, but some

5   of the things I think are interesting -- well, two things:

6   One, there were a number of convictions for which there were

7   zero criminal history points because of age, so -- and I

8   counted up one, two, three, four, five, six, seven -- seven

9   convictions for which she got zero criminal history points

10  because of their age, so that's not even included in the 31

11  criminal history points.

12         The other thing I notice is, there were multiple

13  occasions -- and I'm not going to go through each of them,

14  but there were multiple occasions where she was put on

15  probation or parole and then was revoked for continuing her

16  criminal activity, and this is important because two of the

17  factors are to protect the public from future crimes of the

18  defendant and to promote respect for the law.  Obviously,

19  there's little respect for the law or for any court that has

20  ordered her to conduct herself in a way while she's on

21  probation or parole.  And when I say "conduct herself in a

22  way," all she has to do is obey the law.  It's not like she

23  has to do something miraculous that other people in this

24  country don't have to do.  All she has to do is obey the

25  law, and she is unable to do that, and she's been unable to

1    do that from age 24 up until age 59.

2            You've also mentioned the 25 other arrests that did

3    not result in conviction.  That also needs to be factored in

4    when you're thinking about protecting the public from future

5    crimes of the defendant.

6            We get to the issue of -- we get to the issue of

7    health.  I know that's a factor the Court has to consider.

8    The government's position is very simple:  Her health did

9    not prevent her from committing these crimes in any way.  In

10   fact, as I mentioned, she was in the hospital still

11   committing crimes.  Her health did not prevent her.  She

12   was -- and I think she's been bedridden for a couple years,

13   the presentence report indicates, but she was selling drugs

14   from her bed every day in Centralia.  We have videos where

15   she will lay in bed and was just sitting there selling drugs

16   from the bed.  When they did the search warrant, the bag of

17   drugs, approximately 2 ounces of methamphetamine, was in her

18   lap.  She had pill bottles next to her where she sold drugs.

19   So her health condition and being bedridden and all the

20   paragraphs about all the conditions she had did not prevent

21   her from selling drugs.

22           And I submit, Your Honor, when she gets out of

23   prison, there's nothing to prevent her from doing the same

24   thing.  One might say, well, her age might prevent her.

25   Well, she's 59 years old now.  That didn't prevent her.  Ten

1    years from now, 15 years from now, 20 years, what's going to

2    prevent her?  All she does is sits in bed.  Her family

3    brings her drugs.  She can do that at age 70, age 75.

4    There's nothing to prevent her -- well, nothing so far has

5    ever prevented her from doing that; not her health, not her

6    weight, not anything.  And I don't see anything that's going

7    to change in the future.  Normally, as people get older they

8    mature, they stop doing -- always hear about they stop

9    committing crimes as they get older.  That's not the case.

10   That is not the case in this situation.

11          So, the government believes, after all factors have

12   been considered under 3553(a) -- and I realize it's a tough

13   decision, I realize it's a very tough decision, but after

14   all factors have been considered and analyzed, there's no

15   basis to go below the guideline range in this case, and

16   that's the government's recommendation of sentence within

17   the guidelines of 360 months.

18          Thank you, Your Honor.

19          **THE COURT:**  And for anything in particular with

20   respect to the supervised release?

21          **MR. NORWOOD:**  Oh, supervised release, I believe the

22   term is minimum of four years.  I believe four years would

23   be appropriate.  With respect to a fine, I would leave the

24   fine to the Court's discretion based on her financial

25   capabilities.  I know she's on SSI, or was on SSI

1   disability, making, I think it was $735 a month, so I would

2   impose -- I would probably go below that and impose an

3   amount the Court believes is appropriate.  I'm not sure if

4   she can work here while in BOP to help pay off that fine.  I

5   don't know what her physical capabilities are or if they

6   have any jobs she can perform while she's sitting in her

7   cell, but I would leave that to the Court's discretion.

8          **THE COURT:**  Okay.  Thank you, Mr. Norwood.

9          Mr. Humphrey, you can now make any argument and

10  give me your sentencing recommendation.

11         **MR. HUMPHREY:**  Thank you, Your Honor.

12         I guess it's very important, and things to note,

13  the Court already is aware of that when we're looking at

14  situations like this.  Obviously, the Sentencing Guidelines

15  are advisory and it gives you the discretion in this

16  situation.  And, obviously, in this case we have a statutory

17  range of punishment of five to 40 years on Count 2, and up

18  to 20 years on each of the other counts.

19         3553(a) talks about the need for a sentence that is

20  sufficient but not greater than necessary, and in so doing,

21  we have to look at the entire circumstances of Ms. Strowder.

22         And I wish, as I sit here, Judge, that I could say

23  to you, when you were reciting about Ms. Strowder's criminal

24  history, that those things were not accurate, that they

25  weren't true.  They are.  She's in criminal history category

1    of 6.  She has 31 criminal history category points.  But I

2    think the context is important, and looking at her history,

3    because Ms. Strowder, at an early point in her life, got

4    involved in a number of things that she shouldn't have been

5    involved in.  She was involved in fraud and all those other

6    crimes that you've already listed, but I think that there is

7    something that is key in this situation, is that she was not

8    involved in any sort of drug dealing until she got caught up

9    in this current situation.

10         And, in fact, in looking at her criminal history,

11   we go back to -- from 2008 until what she's charged with

12   now, she had the one case involving the dogs being at large

13   in 2017.  She did have a period of time where she was able

14   to keep things together after a large portion of her life

15   where she did not.

16         But, also, when we're looking at her involvement in

17   the activity that has brought her here today, when we're

18   talking about selling of crack cocaine beginning in 2013,

19   and then the methamphetamine in 2017 and 2018, what happened

20   in Ms. Strowder's life in that timeframe?  What changed?

21   What happened between 2008, when seemingly things started to

22   calm down in her life, and 2013 and 2014, when she went down

23   a path of selling drugs, which was something that she had

24   not been involved with before?

25         Ms. Strowder at that point was no longer

1    ambulatory.  She was at that point reliant upon other
2    people.  Yes, she made decisions in her life and she made
3    bad decisions in her life, but we have to look at it, at the
4    total picture of what was going on with Ms. Strowder.  At
5    this point she can no longer take care of herself, she can
6    no longer get out of a bed, she can no longer walk around.

7         And when we're talking about all of those
8    individuals who discuss what they were doing as far as
9    purchasing drugs, we cannot ignore the fact that
10   Ms. Strowder was not in this alone.  In all of those reports
11   about going to get drugs from Ms. Strowder, she wasn't there
12   by herself.  And, yes, there were children present but they
13   were not her children.  There were other family members who
14   were there, other family members who were actively taking
15   part in dealing drugs, and those same individuals who had to
16   take care of Ms. Strowder.

17        Now, I'm not saying that Ms. Strowder didn't make
18   bad decisions, because clearly she did, but also, there were
19   other people there that she relied upon who were involved in
20   this activity.  Ms. Strowder never went to get a single
21   drug.  She could not.  She couldn't get out of bed and do
22   that.  Ms. Strowder didn't go to her kitchen and weigh drugs
23   on the scale where they found residue on the scales.  She
24   couldn't get out of bed to go to the bathroom.  Ms. Strowder
25   sold drugs but Ms. Strowder could not go to the store and

1   spend a single dollar earned at that residence.  And she is

2   reliant upon those individuals to take care of her.

3   Ms. Strowder can't eat, she can't go to the bathroom.  She

4   is there.

5            And, ultimately in this situation, when it's really

6   apropos, she's left holding the bag.  Literally she's left

7   holding the bag because it's easiest for those individuals

8   to let her sit there and sell the drugs and suffer the

9   consequences because there was this concept that, *Hey, you*

10  *know what?  What are they going to do?  What are they going*

11  *to do to me?*

12           Look at the situation.  We're here in western

13  Tennessee because of the difficulty of transporting

14  Ms. Strowder back to East St. Louis.  So there was an

15  arrogance in this thinking, *Well, if we just put it on her,*

16  *nothing's going to happen to her.*  And you know what?

17  Ms. Strowder bought into that.  She did.  She did buy into

18  that.  She thought that nothing would happen to her.  But I

19  had a conversation with Ms. Strowder, and she said to me

20  that -- and I think that this is also very important when

21  you're looking at this, sometimes -- and the saying about

22  being knocked off of your high horse.  She talked about, on

23  December 5th, when her bond was revoked and she knew that

24  she was going in, that there was that realization that this

25  is real, that I know that I messed up and the game is over.

1          Also, yes, she's 60 years old, but in the context

2     of being 60 years old, we have to look at her background.

3     And we're talking about someone -- obviously, sitting here

4     in this room with the machines going, we know that her

5     medical situation is serious.  This is real.  This is also a

6     person who is looking at all of this from the perspective

7     of, any moment in jail for me is a death sentence, because

8     she suffers from COPD, suffers from congestive heart

9     disease, she suffers from so many things.  We have the list

10    of medications that she has to deal with.  High blood

11    pressure, dealing with bed sores, these are all real things

12    that she is dealing with.  In her mind, *I am going to die in*

13    *prison.  I'm not going to see my family again.*

14         So, when we talk about acceptance of

15    responsibility -- and I know acceptance of responsibility is

16    very important in federal cases.  And, Ms. Strowder, her

17    goal clearly in this situation was to stay out as long as

18    possible because she doesn't, in her mind, know how long she

19    will be here.  So, yes, it was important to her to be at

20    home.  Yes, it was important to her to be around family

21    members, even family members who were taking advantage of

22    her.  That was important to her.  And, so, yes, she wanted

23    to stay out.

24         But when we're talking about when she was brought

25    in, when she was initially -- when the search warrants were

1    executed and they went into her home and she was brought in,

2    what did Ms. Strowder do when she was brought into the

3    sheriff's office?  She gave it up.  She told everything that

4    was going on.  And then from that point on, what was her

5    goal?  Yes, to try to maintain relationships with her

6    family, to be out as long as she possibly could because that

7    was important to her.  Because, honestly, in her mind she

8    doesn't know how much longer she's going to be here.  And

9    that's not an excuse, that doesn't eliminate what she did,

10   but it is something to consider, it is a factor in what was

11   going on here.

12          And it's also a factor in looking at this and the

13   other individuals who are around who made sure that they

14   kept an arm's length in these transactions, that clearly

15   they benefited from because, like I said, she could not

16   spend a dime of anything that was made there.  She couldn't

17   go to the store, she couldn't get up out of bed, she

18   couldn't cook for herself.  Yes, her home was open to other

19   individuals, to family members.  Yes, there were children

20   present, but it wasn't as if she was just directing

21   everything that was going to go on, that these kids were

22   going to do X, Y, and Z.  There were other individuals

23   there.

24          Her brother.  In these reports from these

25   individuals who were talking about what was going on in that

```
 1    house, who had the guns?  Him.  He was the one.  I came to
 2    purchase and he pulled a gun on me.  That wasn't something
 3    that Ms. Strowder did.  She's not charged with a 924(c)
 4    count here.  She wasn't holding onto any guns, but it was
 5    made sure that she held onto the drugs.
 6          So, in this situation, when everything -- the house
 7    of cards comes crashing down, who is sitting here in this
 8    position?  She is.  And so now she has to live up to the
 9    consequences of her actions, and she's prepared to deal with
10    the consequences of her actions, and she did.  She did plead
11    guilty.  Yeah, it wasn't in the timely fashion that everyone
12    would have liked, but we still have to remember things from
13    her perspective:  I may only be 60 years old, but with what
14    I'm facing, I'm not going to be around.
15          Mr. Norwood said -- and I know he wasn't trying to
16    be cavalier when he said, at 70 years old, what's she going
17    to be doing?  Is she going to be selling drugs from a
18    hospital bed?  From her perspective she doesn't believe
19    she's going to be around at age 70.  And we talk about, you
20    know, life expectancy of individuals.  What is the life
21    expectancy of someone with Ms. Strowder's health conditions?
22    What's the life expectancy of someone at Ms. Strowder's
23    weight, with Ms. Strowder's heart condition, with the fact
24    that she's dealing with these infections, uterine
25    infections, potential cancers, COPD?  She's on a breathing
```

1   machine right now.

2         When we're honestly talking about what is going to

3   prevent her from doing this again in the future -- we're

4   sitting here.  This is going to prevent her from doing this

5   in the future, because she has been knocked down, she knows

6   that she can't get away with this.  And you know what?

7   Hopefully at this point her family knows, you can't do this

8   any more because the thing that's going to happen when she's

9   done with the sentence, she's going to be on supervised

10  release.  She knows that.  You're going to set the terms of

11  supervised release.  It's going to be a minimum of four

12  years.  For a minimum of four years somebody's going to show

13  up wherever she is and check up on her.  If somebody is

14  going to continue to try to run some sort of open air drug

15  market there, there are going to be individuals around.

16        We have these allegations of continued drug

17  activity.  There were marshals coming to the house at that

18  point.  These are things that we can make sure are prevented

19  because she knows the game is over.  She knows that this is

20  it.  She is feeling her own mortality in this situation.

21  That is something significant to deal with, to sit here and

22  say to yourself, *You know what?  I have lived my life, and*

23  *my life is probably going to end prematurely, and it's*

24  *probably going to end prematurely in jail away from people*

25  *that I care about, away from my family.*

1          She has relatives that do care about her.  She

2     talked to me about her sister.  And we had this conversation

3     last night, and I was so pleased when we had this

4     conversation.  And she didn't know it because when we had

5     this conversation last night, Ms. Strowder and I -- and I

6     say this laughingly right now, I say we bumped heads.  And

7     when I came in she said, *I hope you have your boxing gloves*

8     *on because we're going to be boxing today.*

9          I said, *No, we're not.  We're not coming in here --*

10    *we're not boxing.  We're going to sit here, discuss this,*

11    *and have rational conversations, and we're going to talk*

12    *about what needs to be done in your situation.*

13          And I told you, *You know what?  On your indictment*

14    *it says Anthonette Strowder, Big Mama.  Big Mama's done.  I*

15    *want to talk to Anthonette Strowder and I want to talk to*

16    *Anthonette Strowder about what's important to her.*

17          And she talked to me about her sister and about how

18    her sister told her, *Don't get involved in these types of*

19    *situations,* how her sister tried to talk her out of this

20    very lifestyle, and that she ignored it, and that her pain

21    was that she was putting her sister through this, that she

22    ignored her advice.  And she began to cry about the fact

23    that she let someone down.

24          And this is the person.  Big Mama is done.  And I

25    understand Big Mama did a lot of things wrong.  Big Mama

1  lived a bad life.  This is no longer Big Mama.  It's over

2  and she knows that that's over, and I think that she knew

3  that it was over the day that she was arrested, the day that

4  she was brought in, because one of the first things that she

5  talked about when she was brought in was -- they said, *Well,*

6  *there's these allegations that you were selling drugs to*

7  *children.*  And that was something, out of all the

8  allegations that were going on, that upset her the most

9  because she said, *I wouldn't do that.  I would not sell*

10  *drugs to children.*  And she told everything that was going

11  on in that house.  She wanted to make that clear, that, *This*

12  *isn't something that I would do.*

13       And even when we talk about those videos -- and,

14  yes, she was videoed selling drugs to individuals.  They

15  came to her room and she would show them the drugs, and in

16  one of those videos she had a conversation with someone that

17  she was selling drugs to, and she said, *You got to get away*

18  *from this lifestyle.*  She talked about, on that video,

19  *You're going to die if you keep doing this stuff.  You need*

20  *to stop.*

21       She's not heartless.  She is an individual who made

22  a lot of mistakes, a lot of mistakes.  I wish I could say

23  that she wasn't in criminal history category 6.  She is.

24  But she's also an individual who is worth redeeming.  She is

25  an individual who is going to learn from these mistakes.

```
1    She is an individual, for whatever amount of time that she's
2    away from her friends, family, and loved ones, she is
3    learning because she knows that she's not going to be here
4    for the longest amount of time.
5              And we're looking at these situations, and
6    especially in the context of what they're trying to do with
7    court reforms about compassionate release and situations
8    like that.  With someone in Ms. Strowder's health
9    conditions, what is a sufficient but not greater than
10   necessary punishment in a situation like this?  And I know,
11   Judge, that I'm coming from a position that is radically
12   different than Mr. Norwood, and I understand his position,
13   but I hope that you understand mine.
14             And when I look at this person who is dealing with
15   what she's dealing with, and with the amount of time and
16   things that she's served in the past, I would say,
17   Your Honor, that a sentence of five years for someone who is
18   60 years old, about to be 60 years old, in her current state
19   and medical conditions, someone who has honestly learned a
20   lesson, because she is sitting here holding the bag from a
21   family enterprise while those individuals are still out
22   there, this is someone who has learned a very valuable
23   lesson.  She's been knocked off of her high horse and she
24   isn't Big Mama any more.
25             Anthonette Strowder, if she receives a sentence of
```

1    five years, that is significant.  That's a significant

2    amount of time for this individual who is looking at the

3    clock, saying to herself, *How much time do I realistically*

4    *have left?*  And that's not something that -- you know, a lot

5    of times there are people who are like, *Oh, well, you know,*

6    *I'm feeling my mortality,* but in her situation she honestly

7    is.

8            When you look at everything that's been reported

9    here, all of the need, the fact that she has to have

10   individuals who come in and move her around so she can't get

11   bed sores, the fact that she cannot get up and go to the

12   bathroom, the fact that she is on this extensive list of

13   medications, the fact that we're in this very room right now

14   because she couldn't be held in a cell anywhere else shows

15   you the reality of her medical situation, the reality of her

16   circumstances, and the reality of what she is going through.

17           She is sorry, she has made mistakes, and five years

18   is a significant amount of time for her to deal with those

19   mistakes.  It's a significant amount of time for her to

20   learn that that lifestyle is over.  And, Your Honor, I

21   believe that that lifestyle is over.

22           Thank you.

23           *THE COURT:*  All right.  Thank you, Mr. Humphrey.

24           Do you know if there have been other prosecutions?

25   You talked about all the other people that were bringing

1    things in.  Have those people been prosecuted as well, do

2    you know?

3         **MR. HUMPHREY:**  There was her nephew.

4         **THE COURT:**  Maybe Mr. Norwood could answer that

5    better.

6         **MR. HUMPHREY:**  Her -- I know her nephew had been

7    prosecuted by the state for, I guess it was destruction of

8    evidence.  That's correct, George?

9         **MR. NORWOOD:**  I don't know the answer to that,

10   Judge.

11        **THE COURT:**  There have been other federal

12   prosecutions?

13        **MR. NORWOOD:**  There have not been federal

14   prosecutions because Ms. Strowder refused to cooperate to

15   allow us to continue those investigations.

16        **THE COURT:**  All right.  I'll give you the last

17   word, but anything else you wanted to say?

18        **MR. NORWOOD:**  Just a few things, Judge.  Again, I'm

19   not trying to belabor the points.

20        One, I do want to mention though that the

21   government -- I'm not sure if you were there the morning she

22   pled guilty --

23        **THE COURT:**  No.

24        **MR. NORWOOD:**  -- in the courtroom.

25        The government did dismiss Count 1, which had a

1    ten-year mandatory minimum.  It was -- how do I want to say

2    this?  This has been an unusual case from the start, I can

3    say.  I think Judge Herndon was looking at me -- basically

4    we had the jury assembly room into a courtroom, and

5    Judge Herndon's looking at me like, *Mr. Norwood?*  And I'm

6    like, *I understand, Judge.*  But we tried to resolve it, and

7    we did, so that was a benefit to the Court.  But it did have

8    a ten-year minimum that the government still believes it can

9    prove.  Now, regardless of what you do, Judge, the

10   government will dismiss Count 1 because that was our

11   agreement, but I do want to say that.

12          With respect -- I appreciate Mr. Humphrey's

13   argument and I appreciate his passion and his belief in his

14   client.  There were some things though that I don't know are

15   facts in the presentence report.

16          For example, he said between 2008 and -- well, she

17   got out of prison in 2011, according to paragraphs 64 and 65

18   of the PSR, so according to Mr. Humphrey, sometime between

19   May of 2011 and sometime 2013 she became non-ambulatory.

20   The government doesn't see that anywhere in the record.  On

21   her cell phone there were videos on her partying and moving

22   around.  I didn't know this was going to be an issue or I

23   would have this video here with the cell phone.  I'm not

24   sure there's any evidence that she was not ambulatory

25   between -- after 2011, and at what point she became

1    non-ambulatory.

2         But the fact remains, even when she was

3    non-ambulatory, she continued to sell drugs.  Now she wants

4    to blame -- I got to be careful.  It appears that she wants

5    to say other family members made her sell drugs because she

6    couldn't move and she was dependent upon them.  She was

7    dependent on them to feed her, allegedly; she was dependent

8    on them to buy something for her.  So it appears that she

9    said they were making her sell drugs.  I don't think that's

10   the case.  I think it was a voluntary decision.  There's no

11   evidence that she was forced to sell drugs, and that's

12   evidenced by when she's in the hospital.  Nobody can force

13   her to sell drugs from there.  And we heard about this,

14   well, look at her condition, and in this condition she has

15   been taken down a peg.  Well, I don't think so because she

16   was in this condition in the hospital and still sold drugs.

17   She was still selling drugs.

18        When I look at the PSR that lists all the

19   conditions she had throughout her life and recently, none of

20   that stopped her, so I just don't understand the argument

21   that her health, which did not prevent her from committing

22   crimes, is now a factor which should prevent her from

23   receiving the consequence of those very crimes.

24        It was argued that on the day she was arrested it

25   was over.  She -- the day she was arrested, it was over, she

changed.  No, she didn't.  She was selling drugs the entire
time she was on bond 'til the time -- the day she was
arrested by federal authorities and released on bond did not
change her one iota.

I'll even direct the Court to paragraph 25 of the
presentence report because I think this is indicative of her
personality.  This was December of 2017, so it was five
months after she was arrested, and she called the police
because she was having problems with Anthony McGee, but she
told the police officer that she sells -- she knows she
sells drugs and she will continue to sell drugs until she's
incarcerated.  That was what she told the police.  And it's
the last sentence in paragraph 25 [as read]:  *I will
continue to sell drugs until I'm incarcerated,* because she
believed nothing would happen to her.

Marion County obviously wasn't doing anything.  The
state court system was doing nothing.  She was freely able
to sell drugs and nothing happened.  Those buys from 2014 of
the charge had been pending.  Nothing happened.  They -- the
state system has not, for whatever reason, and probably
because of all the difficulties we are incurring in just
prosecuting her, the state system said, we don't want to
have that.

Mr. Humphrey indicated that when -- on the videos
when she was selling drugs she told one person basically,

1    *You should stop doing this.*  Well, that is true.  She told

2    the confidential source who was buying crack from her, *Don't*

3    *spend all your money on this,* but then an hour later she

4    sold her more crack.  So you can't make the argument she

5    told her quit buying crack, don't spend all your money on

6    this, and an hour later sell her more crack cocaine.  It's

7    about business.  It's about money.  That's all this case is

8    about.

9            You know, I understand her health conditions.  That

10   didn't stop her.  What would her sentence be?  I would

11   suggest the sentence should be the same.  And, again, Judge,

12   I realize it's a tough decision, but the government believes

13   that a guideline sentence is appropriate, and there is

14   nothing in the 3553(a) factors, when you look at them, that

15   require any deviation from the guidelines.

16           Thank you.

17           **THE COURT:**  All right.  Mr. Humphrey, would you

18   like to respond?

19           **MR. HUMPHREY:**  Your Honor, just very, very briefly.

20           There was, and it -- to follow up on what

21   Mr. Norwood said, that was not something that was noted in

22   the PSI.  It was actually something that came up during

23   conversation during her arrest interview where it was

24   discussed, hey, you know, you were -- back in 2014, I think

25   that was about the time that you were -- that's about the

1      time that you stopped walking.

2              If I'm not mistaken, you were present during that

3      interview, correct?

4              *AGENT BURTON:*  No, sir.

5              *MR. HUMPHREY:*  You were not.  I'm sorry.  I

6      apologize.  But that was a conversation that was had by the

7      sheriffs.  It's something that they noted, that she had not

8      been walking around from that time of being familiar with

9      her.  So, just as a clarification.

10             *MR. NORWOOD:*  Your Honor, if Mr. Humphrey

11     represents that, I have no dispute about that.

12             *MR. HUMPHREY:*  So, just that point in

13     clarification.  And, Your Honor, I don't have anything

14     additional to really add to what I've argued before.  I just

15     think that we're looking at 3553(a) factors.  I think that

16     these are things that are very, very important to consider.

17     They're why the guidelines are advisory.  And I think that

18     that sentence is significant to deter Ms. Strowder.

19             *THE COURT:*  All right.  Thank you, Mr. Humphrey.

20             Deana, is there anyone in the courtroom yet at this

21     time?  Anyone who wants to make a statement?

22             *COURTROOM DEPUTY:*  No, ma'am, there's not.

23             *THE COURT:*  Okay.  All right.

24             Well, Ms. Strowder, you have the right to say

25     anything that you wish to say.  Judge Herndon probably told

```
1    you that at the time of your plea.  You don't have to say
2    anything if you don't want to say anything.  I won't hold it
3    against you if you don't, but if you do want to say
4    something, now's the time.
5              THE DEFENDANT:  First of all, I want to apologize
6    to the court system of having to come out like this for me.
7    I want to say, maybe what Mr. Norwood -- I'm not going to
8    say what he said ain't true.  Yeah, I made bad decisions,
9    but all that's not true.  I make a lot of bad decisions and
10   I learned from those decisions.
11             Them people use drugs made deals for they time to
12   get cut down to make lies up on me.  I promise you, half of
13   that is lie.  Yeah, I was going -- I was selling dope, but
14   was it mines?  Was I?  No.  Was I told that, by the
15   condition I'm in, that the system wouldn't do nothing to me?
16   Yes, I was told that.  Am I here now to this day?  Yes.  Do
17   I regret it every day I've been here, sitting here?  I
18   fucking regret it, yes, I do.  I regret it bad.  I regret
19   it.
20             If I could change the hands of time back, I would,
21   but I can't.  I can't change that.  I can't change it.  If I
22   could, I would, but I can't change that.  That's something
23   that can happen and I got to deal with it.  But as far as me
24   being a bad person that need to be in prison the rest of my
25   life, that's a not true statement.  That's a non-true
```

1   statement.

2          Yeah, I'm not saying don't punish me for my crime

3   that I committed.  No, I would be lying to myself to say I'm

4   supposed to walk scott-free for what I did.  No.  I want to

5   accept my punishment because I know I was doing wrong.  I

6   never had no kids or nothing, I never sold to no kids.

7   Every one of them come here under oath and say that, I

8   promise you they can.  That was a lie right there.  None of

9   those kids was mines.

10          I had no control in that house.  Yeah, it was my

11  house, but other people was coming in controlling stuff,

12  things was going on.  I wasn't even aware of what was going

13  on in the house.  I didn't even know nothing about the gun

14  situation 'til they just mention it right now.  It was never

15  brought up to me while I was going through this court

16  system.  A lot of this stuff I'm just now hearing.  And I'm

17  so serious.  Am I hurt inside right now?  Yes, because I

18  look like I'm a worthless person.  That's how they making me

19  feel, like I ain't nothing.  I'm still a human being.

20          Yeah, I make mistake.  We all make mistakes in

21  life.  I'm not asking you all to overlook my mistakes.  I've

22  apologized for what I did.  That's the most I can do.  I

23  guarantee you everything, I would not walk out this door the

24  same way I walked in here, and I mean that from my heart.

25  I'm sincere about that.  And I don't care who don't believe

1   me and I don't care who say I was lying on what because that

2   man upstairs know I'm telling the truth.  That's all -- they

3   can't -- that's all I got to say.

4         **THE COURT:**  All right.  Well, thank you,

5   Ms. Strowder.

6         Obviously, this is a very difficult case for many

7   reasons.  Congress has provided some guidance, of course, as

8   to what is appropriate, both from a minimum on Count 2, a

9   maximum on Counts 3 through 7.

10         So, I've gone over the nature and circumstances of

11   the offense and Ms. Strowder's history and characteristics.

12   Mr. Humphrey points out the Sentencing Guidelines are

13   advisory, and of course they are, and I'm glad that they are

14   because it allows me to actually look at what is an

15   appropriate sentence in each case.  What is sufficient but

16   not greater than necessary?

17         Now, Ms. Strowder's criminal history is very

18   troubling.  As I said, I don't think I've ever, ever seen 31

19   criminal history points.  And a lot of convictions did not

20   produce any criminal history points at all.  Now, early in

21   life, it's true, it was a lot of fraud and credit card

22   theft, things like that, but then certainly at some point,

23   by 2013, she was selling a lot of drugs, and maybe that is

24   the point where she was no longer ambulatory.  And I don't

25   doubt that some people took advantage of her, that she

1    didn't do this alone, because she couldn't get out of bed to

2    do anything.

3          The medical situation is very real.  She has a

4    number of very serious conditions, and, of course, that's

5    why we're all here, because it's hard for her to be

6    transported.  I do fear that any sentence that I impose

7    could be a life sentence.  I think that this arrest

8    certainly likely conveyed that this is not the lifestyle

9    that she should have and that the federal government was

10   willing to prosecute her when others were not.

11         Having considered all of these factors,

12   Mr. Humphrey makes very good and compassionate arguments,

13   but if this were a case where sometimes I see, where the

14   government waits a while to prosecute someone, and in that

15   time they've developed serious health problems or grown old

16   or whatever, I might see this case differently, but she did

17   continue.  Her age and her health did not prevent her from

18   committing these crimes.  She sold drugs from her bed.  And,

19   again, it's not a case where now she's older and the

20   situation has changed.

21         So certainly I think something more than what

22   Mr. Humphrey argues for is appropriate, but I have no doubt

23   that a 360-month sentence would most certainly be a life

24   sentence for Ms. Strowder.  I don't know if I'm going to

25   live another 30 years, and I don't have the health

1    conditions that she faces.

2            So, I'm going to impose a sentence of 20 years.

3    That's 240 months on each count.  That's the maximum on

4    Counts 3 through 7, and 20 years on Count 2.  Those will all

5    run concurrent.  Now, that is less than the guidelines, but,

6    as I said, I think that a low end guideline sentence is

7    greater than necessary in this case.

8            Twenty years is a significant sentence to reflect

9    the seriousness of the offense, promote respect for the law,

10   and provide just punishment.  It's comparable in other

11   serious drug cases to sentences that are imposed.  As the

12   government points out, Ms. Strowder was not addicted to the

13   drugs she sold.  She was selling them for whatever reason

14   but causing great harm to the people in Southern Illinois,

15   especially the Centralia community that has really been

16   devastated by drugs.

17           I'm troubled that there were kids involved.

18   Whether they were -- Ms. Strowder wanted them to be

19   involved, whatever the case was, the fact is that there were

20   kids exposed to this lifestyle.  One thing I see every day

21   is the chain of just one day we see somebody who's parent

22   was standing in this situation 20 years ago.  It's just a

23   cycle because people get exposed to it at a young age.

24           Also, there are many reasons for a guideline

25   sentence.  I am troubled by her conduct on bond, that she

USA vs. Strowder, #17-30120                    3/12/19 - Pg. 40

```
 1    was still selling and using.  And I know, as part of plea
 2    negotiations, the government dismissed Count 1, but
 3    certainly I think that a significant sentence is important
 4    to provide specific deterrence because one thing I always
 5    look at is:  Were there other jail sentences, prison
 6    sentences?  Were there other terms of probation or parole
 7    that someone was given?  And that's the chance to be the
 8    wake-up call and stop conduct.  But in this case, as I said
 9    at the beginning, she's been in local custody, state
10    custody, federal custody throughout her life, and those
11    sentences did not deter her.
12             As we pointed out, there's a number of convictions.
13    31 is more than double the points required to get in
14    Category 6, yet there were a number that didn't get aged.
15    So there are many reasons, as I said, for a guideline
16    sentence, as the government argues, but on the other hand, I
17    know that 30 years would be a life sentence.  And I think
18    she should be given an incentive while incarcerated to
19    improve her health, to behave; not that I think she could
20    probably get in much trouble, but to improve her health,
21    have good conduct, and rehabilitate herself.  So, there is
22    the hope that one day she will be out and be a free person
23    again.
24             Certainly, a 20-year sentence will protect the
25    public from further crimes for a significant period of time.
```

```
1    And I have no doubt that the Bureau of Prisons can provide
2    her all of the medical care and corrective treatment that
3    she needs.  And as far as general deterrence goes, certainly
4    the public sees that this type of crime is being taken
5    seriously and punished.
6         I'm going to impose five years of supervised
7    release -- that's the maximum guideline on Count 2 -- and
8    then three years on Counts 3 through 7, which is the --
9    well, I guess that's the guidelines.  I'll do five on Count
10   2, three on Counts 3 through 7, to run concurrent.  I'm not
11   going to impose a fine.  She does not have the ability to
12   pay a fine anywhere within the guideline range, and she does
13   owe the $600 special assessment of $100 on each count.
14        So, weighing all of the aggravating and mitigating
15   factors here, I believe that this sentence is sufficient but
16   not greater than necessary to comply with the purposes of
17   sentencing.
18        Now, with respect to supervised release, I am not
19   inclined to impose any special conditions.  I think, given
20   the length of sentence, that would be something more
21   appropriately determined when she is released from custody.
22        Mr. Norwood, do you have any objection to me only
23   imposing the mandatory and administrative conditions?
24        MR. NORWOOD:  No, Your Honor.
25        THE COURT:  Okay.  Mr. Humphrey, I assume that
```

1    that's acceptable to you?

2              *MR. HUMPHREY:*  Yes, Your Honor.

3              *THE COURT:*  Okay.  Well, as I said, I've considered

4    all the information in the presentence report, including the

5    guideline computations and the 18 U.S.C., Section 3553(a)

6    factors.

7              Pursuant to the Sentencing Reform Act of 1984, it

8    is the judgment of the Court that the defendant,

9    Anthonette Strowder, is committed to the custody of the

10   Bureau of Prisons to be imprisoned for a term of 240 months

11   on each of Counts 2, 3, 4, 5, 6, and 7, all to be served

12   concurrently.

13             Now, Ms. Strowder, you will have to pay the

14   United States a special assessment of $600.  That's payable

15   through the clerk of the United States District Court.  You

16   will have to notify the United States Attorney for this

17   district of any change of name, residence, or mailing

18   address until paid in full.  Having assessed your ability to

19   pay, payment of the total criminal monetary penalties shall

20   be paid in equal monthly installments of $50, or 10 percent

21   of your net monthly income, whichever is greater.  If you

22   have not paid that $600 by the time you are released, that

23   will become a term of your supervised release.

24             Upon release from imprisonment you will be placed

25   on supervised release for a term of five years.  This is

```
 1    five years on Count 2, three years on Counts 3 through 7,
 2    all terms to run concurrently.  Within 72 hours of release
 3    from the custody of the Bureau of Prisons, you shall report
 4    in person to the United States Probation Office in the
 5    district where you are released.
 6              Now, while on supervision you will be subject to
 7    and required to comply with conditions of supervision that
 8    are ordered by the Court.  Now, as I said, Ms. Strowder, at
 9    the beginning of the hearing, you told me you had reviewed
10    these with Mr. Humphrey.  Do you remember that?  Will you
11    answer out loud for the court reporter?
12              THE DEFENDANT:  Yes.
13              THE COURT:  So, as I said, I'm not going to impose
14    the special conditions.  A hearing can be held later to
15    determine which of those are appropriate.  But, the
16    mandatory conditions being just what they say, they have to
17    be imposed in every case, so that is:
18                 That you shall not commit another federal,
19                 state, or local crime;
20                 that you shall not unlawfully possess a
21                 controlled substance;
22                 that you shall refrain from any unlawful use
23                 of a controlled substance and submit to one
24                 drug test within 15 days of release from
25                 imprisonment and at least two periodic drug
```

1            tests thereafter, as determined by the Court,

2            not to exceed 52 tests in one year.

3              You must also cooperate in the collection of

4            DNA as directed by the probation officer.

5            Do you have any question about those?

6            **THE DEFENDANT:**  No, ma'am.

7            **THE COURT:**  Okay.  Then there are administrative

8    conditions:

9              First one is that you must report to the

10           probation office in the district where you are

11           released within 72 hours of release from

12           custody of the Bureau of Prisons.

13             You shall not knowingly possess a firearm,

14           ammunition, or destructive device.  You shall

15           not knowingly possess a dangerous weapon

16           unless approved by the Court.

17           Do you have any question about those?

18           **THE DEFENDANT:**  No.

19           **THE COURT:**

20             You shall not knowingly leave the judicial

21           district without the permission of the Court

22           or probation officer.

23             You shall report to the probation officer in

24           a reasonable manner and frequency directed by

25           the Court or probation officer.

```
1            Do you have any question about those?

2       THE DEFENDANT:  No.

3       THE COURT:  And, while on supervised release:

4         You shall respond to all inquiries of the

5       probation officer and follow all reasonable

6       instructions of the probation officer.

7         You shall also notify the probation officer

8       prior to any expected change or within 72

9       hours after an unexpected change in residence

10      or employment.

11      Do you have any question about that?

12      THE DEFENDANT:  No.

13      THE COURT:

14        You shall not knowingly meet, communicate,

15      or otherwise interact with a person whom you

16      know to be engaged or planning to be engaged

17      in criminal activity.

18        And, you shall permit a probation officer to

19      visit you at a reasonable time at home or at

20      any other reasonable location and shall permit

21      confiscation of any contraband observed in

22      plain view of the probation officer.

23      Do you have any question about that?

24      THE DEFENDANT:  No.

25      THE COURT:  Okay.  And, finally:
```

```
 1                    You shall notify the probation officer
 2                within 72 hours of being arrested or
 3                questioned by a law enforcement officer.
 4                Do you have any question about that?
 5       THE DEFENDANT:  No.
 6       THE COURT:  I will further find that Ms. Strowder
 7   is unable to pay the costs of incarceration or supervision,
 8   and they are waived.
 9            Now, Mr. Norwood, do you request any further
10   explanation of the reason for my sentence?
11       MR. NORWOOD:  No, Your Honor.
12       THE COURT:  Okay.  Mr. Humphrey?
13       MR. HUMPHREY:  No, Your Honor.
14       THE COURT:  And are you satisfied that I addressed
15   your main arguments in mitigation?
16       MR. HUMPHREY:  Yes, Your Honor.
17       THE COURT:  Now, Ms. Strowder, you can appeal your
18   conviction if you believe that your guilty plea was somehow
19   unlawful or involuntary or if there's some other fundamental
20   defect in the proceedings that was not waived by your guilty
21   plea.  In addition, you have a statutory right to appeal
22   your sentence under certain circumstances, particularly if
23   you think the sentence is contrary to law.  With few
24   exceptions, any notice of appeal must be filed within 14
25   days of judgment being entered in your case or within 14
```

1   days of the government filing a notice of appeal.  I expect

2   I will enter judgment either later today or tomorrow.

3           If you're unable to afford the services of a lawyer

4   to handle your appeal, a lawyer will be appointed for you.

5           Do you understand this?

6       *THE DEFENDANT:*  Yes, ma'am.

7       *THE COURT:*  And do you understand, if you cannot

8   afford it, a transcript of the record in the case will be

9   prepared for appeal at the government's expense?  The court

10  reporter's taking down everything that we've said today and

11  at every other hearing that you've had.  If you need those

12  transcripts for an appeal and can't afford it, you can get

13  it for free.  Do you understand that?

14      *THE DEFENDANT:*  Yes.

15      *THE COURT:*  Mr. Norwood, anything else from the

16  government?

17      *MR. NORWOOD:*  Your Honor, the government would

18  orally move to dismiss Count 1.

19      *THE COURT:*  Okay.  Count 1 will be dismissed with

20  prejudice.  Anything else?

21      *MR. NORWOOD:*  I think you made a good enough record

22  as to why we're here as opposed to the Southern District of

23  Illinois.  I'm observing that she is in a hospital bed and

24  is not ambulatory.  All that factored into your decision.

25      *THE COURT:*  Okay.  Yes, all of those factors did.

USA vs. Strowder, #17-30120                    3/12/19 - Pg. 48

```
 1    As I said, I think all of the reasons are set forth in the
 2    notice and order invoking the Federal Judiciary Emergency
 3    Special Sessions Act in that it would be very difficult and
 4    expensive to transport Ms. Strowder.  I was also concerned
 5    about her physical needs would not be met on the way to and
 6    spending a night in East St. Louis and on the way back.  She
 7    is in a hospital bed today.  We are all in a room with her
 8    and she is on oxygen.
 9            Anything else, Mr. Norwood?
10            MR. NORWOOD:  No, Your Honor.
11            THE COURT:  Mr. Humphrey, anything else?
12            MR. HUMPHREY:  Your Honor, just if you would make a
13    recommendation to the Bureau of Prisons for Ms. Strowder to
14    be at a facility that is close to the Southern District of
15    Illinois as possible, and that she be considered for the
16    RDAP program.
17            THE COURT:  Okay.  I'm happy to make those
18    recommendations.
19            Ms. Strowder, the designation process is very
20    complex, but I'll make the recommendation that you be housed
21    as close to Southern Illinois as possible, and they will
22    take that into consideration.
23            And, also, I will recommend the RDAP program.  I
24    encourage you, if you are eligible for that program, to take
25    advantage of that.  Take advantage of of any other treatment
```

1    that the Bureau of Prisons offers, any other rehabilitation,

2    and as I said, this sentence is so that you have an

3    incentive to serve the sentence imposed, but yet, perhaps

4    have the chance of getting out.

5            Anything else, Mr. Norwood?

6            *MR. NORWOOD:*  No, Your Honor.

7            *THE COURT:*  Mr. Humphrey?

8            *MR. HUMPHREY:*  No, Your Honor.

9            *THE COURT:*  All right.  There being nothing further

10   before the Court, the defendant is remanded to the custody

11   of the United States Marshal Service, and the Court's in

12   recess.

13        *(Proceedings adjourned at 10:23 a.m.)*

14                    *   *   *   *

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2

3          I, Laura A. Esposito, RPR, CRR, CRC, Official Court
   Reporter for the U.S. District Court, Southern District of
   Illinois, do hereby certify that I reported in shorthand the
4  proceedings contained in the foregoing 50 pages, and that
   the same is a full, true, correct, and complete transcript
5  from the record of proceedings in the above-entitled matter.

6          Dated this 29th day of April, 2019.

7
                                           Digitally signed by Laura
8       *Laura A Esposito*                 Esposito
                                           Date: 2019.04.30 08:51:18
                                           -05'00'
9       _____
        LAURA A. ESPOSITO, RPR, CRR, CRC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs. Strowder, #17-30120                 3/12/19 - Pg. 51